**UNITED STATES of America,
Appellant,**

v.

**Robert S. FRIEDRICK.**

**No. 87–3001.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 24, 1987.
Decided March 11, 1988.

Ann K.H. Simon, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Michael W. Farrell and Mark J. Biros, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellant.

William D. Beyer, Cleveland, Ohio (Appointed by the Court), with whom James P. Murphy, was on the brief, for appellee.

Before STARR and BUCKLEY, Circuit Judges, and McGOWAN,[*] Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge:

The Government appeals from a determination by the District Court that certain statements made by an FBI agent in the course of interviews conducted by Justice Department lawyers are inadmissible against him in a prosecution for making false statements in previous interviews. Following a thorough evidentiary hearing, United States District Judge George Revercomb concluded that, in view of the totality of the circumstances, the Government obtained the statements from the FBI agent under compulsion, thus rendering them inadmissible under settled principles of Fifth Amendment law. We agree and affirm.

[*] Judge McGowan concurred in the result of this case but died before completion of the opinion.

## I

In 1982, the Government launched an investigation into suspected corruption in the International Brotherhood of Teamsters. Jackie Presser, an official of Teamsters Local 507 in Cleveland, Ohio, and since 1983 president of the International, was suspected of participating in a scheme to "employ" persons who in reality rendered no services to the union, and to convert union funds paid to those "phantom employees." In connection with the investigation, the Government obtained convictions in 1983 of Jack Nardi and Allen Friedman, two "employees" who performed no services for the union. The investigation continued into 1984, with the Government focusing on the activities of Presser and other officials of Local 507.

The investigation was complicated by the fact that Presser, unbeknownst to prosecutors conducting the investigation, had for many years been an informant for the Federal Bureau of Investigation in Cleveland. The FBI relationship began with Agents Patrick Foran and, later, Martin McCann serving as Presser's "handling agents"; finally, Special Agent Robert S. Friedrick, the defendant in this case, stepped into the "handler" role. At the time of the investigation, Friedrick served, as had his predecessors McCann and Foran, in the capacity of supervisor of the FBI's Organized Crime Unit in Cleveland.

Over time, it became increasingly apparent to Justice Department investigators that Presser was connected in some fashion with the FBI's Cleveland office. To explore the nature of this relationship, DOJ investigators met with FBI officials in Cleveland on July 3, 1984. McCann, Foran, and Friedrick, as well as several Government investigators, attended the meeting. The meeting, which was informal in nature, took place in the living room of Foran's in-laws. At that time, there was no reason to suspect that FBI personnel had been involved in illegality. Accordingly, no

oaths were administered, and no transcript taken.

At this meeting, the investigators learned that Presser had indeed served as an FBI informer for many years. The investigators specifically asked the three agents whether Presser had ever been authorized by FBI personnel in Cleveland to employ "no-shows." In response, Friedrick stated that he had personally authorized the hiring of one person, George Argie; Friedrick later maintained that Foran was in fact the agent who authorized hiring Argie. None of the three agents, however, admitted to having authorized the hiring of the previously convicted Jack Nardi or Allen Friedman. As a result, the Government's investigation into Presser's activities continued.

After nearly a year had passed, the Justice Department was preparing to indict Presser for several offenses arising out of his role in the employment of Nardi and Friedman. In June 1985, David Margolis, the head of the Department's Organized Crime and Racketeering Section, held meetings with John Climaco, Presser's attorney, to discuss Presser's status. In the course of those meetings, Climaco informed Margolis that Presser had been authorized by his FBI "handling agents" to employ "phantom employees."[1] Soon after these meetings, on June 20, 1985, Friedrick (and his predecessors, Foran and McCann) were interviewed in Cleveland to explore any possible basis for Climaco's claims. At this interview, which like the July 3, 1984 meeting was not conducted under oath, Friedrick stated that he had personally told Presser *not* to remove Friedman from the union payroll even though Presser had wanted to do so.

Six days later, on June 26, 1985, Friedrick, under orders from his superiors, appeared at FBI headquarters in Washington, D.C., to review and sign a statement reflecting what he had related at the June 20 interview in Cleveland. By this time, the FBI had decided to pursue an internal ad-

---

**1.** Friedrick had met several times with Climaco to prepare him for his meeting with Margolis. Friedrick had also informed Presser of the im-

pending indictment, and had aided Climaco in developing strategies to avoid indictment.

ministrative inquiry into the circumstances surrounding the FBI's "authorizations." In that inquiry, Justice Department lawyers decided to grant Friedrick transactional immunity from prosecution for his actions during the Presser affair.[2] Thus, before requiring Friedrick to sign his statement, the investigators presented him with a Form FD–645.

Form FD–645, and the immunity to which it relates, is central to the issues presented in this case; we therefore pause in the narrative of events concerning Mr. Friedrick to describe the contents of that form and the procedures normally followed in executing it. We take cognizance as well of another document, Form FD–644, which also bears on our analysis. Briefly stated, FBI regulations provide that Bureau employees interviewed pursuant to formal internal administrative inquiries or investigations are to be presented with either of two forms, FD–644 or FD–645. *See* FBI Manual of Administrative Operating Procedures (MAOP) §§ 13–6.1, 13–6.2. Form FD–644 is captioned "Warning and Assurance To Employee Requested To Provide Information On A Voluntary Basis." As the caption suggests, Form FD–644 indicates to the prospective interviewee that his statement is voluntary and that his refusal to answer questions *cannot* result in adverse employment action. Form FD–644 goes on to provide that the Government is free to use any statements by the employee against him in any subsequent criminal prosecution or agency disciplinary proceeding.

Form FD–645, in contrast, is entirely different. It is captioned "Warning and Assurance To Employee Required To Provide Information." Under Form 645 procedures, the FBI may require an employee to provide information, and it may visit sanctions upon an employee, including dismis-

sal, if he refuses to submit to questioning. Since the Form 645 procedures are *compulsory*, the Government may not use an employee's statements against him in any subsequent criminal prosecution (though it may sanction an employee administratively based on his answers). Under Form 645 procedures, not only may the Bureau require an employee to provide information, but it may insist that the employee be completely truthful. The only criminal offense to which the use immunity conferred under Form 645 procedures does not reach is for giving false statements to federal officials, an offense proscribed by 18 U.S.C. § 1001 (1982),[3] the familiar statute under which Friedrick has been indicted in this case.

With this brief background, we resume the narrative of events. Before the June 26, 1985 meeting at FBI headquarters in Washington, D.C., the FBI, jointly with the Justice Department, elected to immunize Friedrick and to focus the administrative investigation on his two predecessors, Foran and McCann. Accordingly, on June 26 Friedrick was presented with a Form 645, which by its terms *required* Friedrick to answer the questions propounded to him. At this meeting, Friedrick for the first time stated under oath that Presser had indeed been authorized by the FBI to employ "no-shows."

Less than a month later, the Government publicly declined prosecution of Presser. In addition, the Government thereafter acquiesced in the voiding of Nardi's and Friedman's convictions. These widely publicized actions were taken, in the main, by virtue of Friedrick's assertions that Presser's conduct had enjoyed FBI approbation.

Unbeknownst to the Justice Department, its understanding that Presser had been authorized by the FBI to employ "phantom employees" was entirely in error. That

---

**2.** As will become apparent, the record is not clear as to the circumstances surrounding the decision to grant Friedrick transactional immunity. *See infra* p. 393 n. 14, p. 396 n. 18. What is clear is that in some (but not all) interviews, Friedrick was provided an FBI form that explicitly conferred upon him use immunity. *See infra* p. 385.

**3.** 18 U.S.C. § 1001 states in pertinent part: "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully ... makes any false, fictitious or fraudulent statements or representation ... shall be fined not more than $10,000 or imprisoned not more than five years, or both."

misapprehension was the product of a calculated lie by Friedrick, who persuasively maintained to investigators that there had been authorizations when in fact there were none. This tangled web of deception, which Friedrick began to weave in Cleveland in July 1984, and which ensnared the Government by virtue of Friedrick's statements in June 1985, soon began to unravel.

The administrative inquiry, begun in June 1985, was soon upgraded to an internal criminal investigation focusing on potential prosecutions of Foran and McCann for obstruction of justice. In conjunction with the now considerably more formal investigation, Government investigators decided that further interviews with Friedrick were needed to explore inconsistencies between his (and his colleagues') July 1984 and June 1985 statements concerning the authorizations given to Presser. Accordingly, Ralph Regalbuto, a Special Agent in the FBI's Office of Professional Responsibility (FBI/OPR), informed Richard Schwein, Assistant Special Agent in Charge of the Cleveland office (and one of Friedrick's two immediate superiors), that Friedrick was to report to Washington on August 12, 1985. Schwein ordered Friedrick to appear, which Friedrick did.

The August 12, 1985 interview was conducted in Washington by lawyers from FBI/OPR. At that time, Friedrick was told that a formal investigation was being undertaken *jointly* by the Bureau and the Department of Justice's Office of Professional Responsibility (DOJ/OPR). Friedrick was further told that the Government's previous grant of immunity would be carried over to protect him in the joint investigation. Accordingly, investigators presented Friedrick with another Form FD–645, which he executed.

The August 12 interview was conducted under oath, but was neither recorded nor transcribed. At the interview, Special Agent Regalbuto explained to Friedrick that he was compelled to speak, but that in return the Form 645 insured that any truthful statements could never be used against him in a criminal prosecution. The formalities of the 645 procedure were scrupulously followed; for example, after a break in the proceedings, Regalbuto reminded Friedrick of his obligations and rights, and reread the Form 645 that Friedrick had executed that morning. Moreover, when the interview continued into a second day, Regalbuto again read the Form 645 warning to Friedrick. At the end of the interview, on August 13, Friedrick signed a statement setting forth the substance of the two-day interview. In essence, Friedrick stuck to his prior story, embellishing some details.[4] The undisputed fact is that Friedrick continued to lie under oath.

One day later, Friedrick telephoned Regalbuto from Cleveland to clarify his statements and to volunteer further information. On August 16, Friedrick once again telephoned Regalbuto. During that conversation, Friedrick admitted that he "lied" about the nature and extent of his conversations with Foran and McCann. Friedrick also admitted that the three agents had discussed among themselves their prospective answers to investigators' questions. According to Regalbuto, these conversations[5] were a continuation of the administrative interview, but no further warnings were given to Friedrick; no Form 645 was read to Friedrick during the calls, nor was a form sent to Friedrick for him to sign afterwards.

The joint administrative and criminal investigations continued into the fall. On September 18, 1985, under orders to submit to further interviews, Friedrick again reported to FBI headquarters.[6] He was promptly escorted across the street to the

---

**4.** For example, contrary to his June 1985 statement, in which he represented that an unnamed agent had authorized the hiring of Nardi, Friedrick stated on this occasion that Presser had told him McCann had given the authorization.

**5.** Plus a third; on August 19 Friedrick again called Regalbuto, this time to decline to take a

polygraph examination which he had volunteered on August 16 to undergo.

**6.** The investigators communicated their directive that Friedrick appear through the same FBI channels that had been used for the August interview.

Justice Department, where the interview was conducted. The interview, which was under oath, recorded, and transcribed, was attended by both DOJ and FBI attorneys. Regalbuto and the DOJ attorneys conducted the questioning; as before, Regalbuto explained to Friedrick the purpose of the interview, furnished him with another Form 645, and related his rights and obligations. Regalbuto informed Friedrick that he was required to be candid, and that his only possible exposure was for any false statements in the course of the interview. During the interview which followed, Friedrick stood by his previous statements.

After Friedrick's September 1985 interview, the Government empanelled a grand jury in Cleveland to hear evidence concerning possible obstruction of justice in connection with the aborted investigation into Presser's activities. The grand jury heard evidence over the course of the fall and into the winter of 1985–86. The concurrent FBI internal investigation continued as well.

Shortly after New Year's Day, Friedrick was again directed—through the same FBI channels employed on the prior occasions—to appear in Washington for another interview. Accordingly, on January 6, 1986, Friedrick reported for the interviews that turned out to be the focus of this case.

Upon reporting to FBI headquarters in conformity with his instructions, Friedrick was told that the interviews would be held at the Justice Department. Friedrick immediately went, unescorted, across the street to the Department, where the interview commenced. Conducting the interview this time were two attorneys whom Friedrick had not previously met, Richard Rogers from DOJ/OPR, and Robert Chapman, an Assistant United States Attorney for the District of Columbia. Regalbuto was not present; indeed, no FBI personnel were present on January 6. The proceedings on that day were not conducted under oath, nor were they transcribed.

At the outset, the Justice Department attorneys explained several matters to Friedrick. Chapman told Friedrick that,

based on the prosecutors' review of his August and September 1985 statements, they believed he might not have told the truth on those two occasions. The purpose of the present interview, Chapman stated, was to determine if Friedrick had been telling the truth in his past interviews. If he had, Chapman went on, then the Government wanted to use Friedrick as a witness before the Cleveland grand jury investigating the Presser affair; if he had not been truthful, the interviewers explained, then he faced possible criminal liability under the false statements statute. Chapman reminded Friedrick that truthful answers given in the August and September interviews could not be used against him in any criminal proceeding (other than for false statements). Chapman explained that the primary purpose of the present interview was to evaluate Friedrick as a potential grand jury witness.

By all accounts, no discussion of immunity occurred on January 6. Friedrick was not furnished with a Form 645, nor was any mention of the previous forms made. In fact, Rogers and Chapman (according to their testimony) made a conscious decision prior to the interview not to furnish Friedrick with or even mention Form 645; indeed, they hoped that Friedrick would make incriminating statements that they could use against him in a subsequent prosecution. *See* Transcript of Suppression Hearing 188, 248, 302, 312, 336 (hereinafter "Tr."). The sole warning given to Friedrick was that the two attorneys believed his August and September 1985 statements were inconsistent with his July 1984 and June 1985 statements, and that Friedrick therefore faced potential liability for false statements. The prosecutors decided *not* to tell Friedrick that the ground rules had, in their view, changed since the August and September interviews.

During the ensuing interview, Friedrick admitted that he had met with Presser and his attorney, Climaco, several times in June 1985 to discuss the alleged authorizations to employ Nardi and Friedman, as well as other aspects of Presser's story. This admission by Friedrick directly contradicted

his sworn statement of August 1985. But in all other respects, Friedrick continued to maintain that the authorizations had been given and that he had been truthful in the past.

The interview continued over the course of the next four days.[7] On the second day, January 7, Friedrick took a polygraph examination for which he had volunteered on the previous day. The polygraph was administered by Paul Minor, an FBI employee, who before questioning Friedrick gave him a form styled "CONSENT TO INTERVIEW WITH POLYGRAPH."[8] After Friedrick executed the consent form, Minor asked him a series of questions, in response to which Friedrick adhered to his story. At a critical point in the questioning, Friedrick answered "no" to four crucial questions regarding the Presser authorizations.[9] At the conclusion of the polygraph, Minor confronted Friedrick and accused him of being untruthful. At that juncture, Friedrick admitted for the first time that the heart of his story was false: neither he, nor to his knowledge anyone else in the FBI, had authorized Presser to employ Nardi and Friedman. After briefly recanting his confession upon renewed questioning by Messrs. Rogers and Chapman (who had not been present during the polygraph exam), Friedrick finally broke down and told the truth.

As the prosecutors proceeded to elicit details from Friedrick, Regalbuto entered the interview room for the first time. Consistent with his prior practice, Regalbuto took a Form 645 from his briefcase; before he could present the form to Friedrick or say anything about it, however, Chapman signalled him not to mention or proffer the Form 645. According to Regalbuto, he did not know whether the form had been administered or not. But because he assumed Friedrick would be given that particular Form "[u]nder the ground rules we had been operating under," he took the form out "to confirm that [Friedrick] either had or had not." Tr. 140. *As Regalbuto saw it, if the ground rules had changed, Friedrick would normally have been given a Form 644.*[10] *Id.* at 141. Regalbuto said nothing about Chapman's waving him off, and the interview continued as before.

After the January 7 breakthrough, the interview adjourned, to be continued the next day. But the interview resumed on January 8 with different procedures: Friedrick was now placed under oath, and

7. Although the interviews lasted for four days, the prosecutors accommodated Friedrick's schedule and desires, to the point of allowing him to commute home to Cleveland each night.

8. The form stated in pertinent part:

YOUR RIGHTS

You have the right to refuse to take the polygraph.

If you agree to take the test, you have the right to stop the test at any time.

If you agree to take the polygraph test, you have the right to refuse to answer any individual question.

WAIVER AND CONSENT

I have read this statement of my rights and I understand what my rights are. I voluntarily agree to be examined by means of the polygraph during this interview. I understand and know what I am doing....

*See* Brief for Appellant at 18 n. 16.

9. The questions were:

(1) Are you withholding anything important about the quashing of the Presser indictment?
(2) Do you know for sure that Presser placed [Nardi and Friedman] on the payroll without FBI authority or knowledge?
(3) Did you ever discuss with Foran or McCann the falsification of information to quash that indictment of Presser?
(4) Are you lying to me about your knowledge of what happened with [Nardi and Friedman]?

*See* Tr. 155–57.

10. It appears that the customary procedure is to present one of the two forms. FBI regulations mandate that employees who are interviewed administratively are to be given either the 645 or 644 form. *See* FBI MAOP §§ 13–6, 13–7. The significance of this omission is, however, unclear on the record in this case, inasmuch as Department of Justice lawyers *alone* conducted the January interviews. In contrast to his prior lead role in the interview process, Regalbuto appeared only intermittently during the January interviews (and not at all on the first day). The record is unclear as to DOJ procedures, if any, for administering such forms. What is clear, however, is that at some point before the DOJ prosecutors began the January interviews with Friedrick, they did furnish a Form FD–644 to Friedrick's predecessor, Foran, in similar circumstances. *See* Tr. 333. With the benefit of that warning, Foran elected not to participate in the interview process.

the interview itself was recorded and transcribed. However, the prosecutors explained none of Friedrick's rights to him; they informed Friedrick once again that the purpose of the interview was to prepare him as a grand jury witness. In this regard, they emphasized Friedrick's obligation to tell the truth:

> MR. ROGERS: [Y]ou've told us a version that's different from what you've told us in the past. What we want to do is take what you've told us over the last couple of days and cover the whole thing all at once. *Now since the* [sic] *version is different from the prior times, and since this is preparatory to a grand jury appearance by you, we want to make sure that this version is the truth, okay? Now, you understand that is your obligation at this point?*

Transcript of Interview, January 8, 1986, at 4 (hereinafter Tr. 1/8/86) (emphasis added).[11]

It was thus made clear to Friedrick that he was being prepared for an appearance before the grand jury and that he was obliged to tell the truth. With these ground rules having been stated, questioning continued through January 8. Toward the close of the day, the prosecutors expressed frustration with Friedrick's gradual revelation of new facts concerning the authorizations and his evolving description of Foran's and McCann's roles. They referred once more to Friedrick's status as a prospective grand jury witness:

> MR. ROGERS: What about Foran and McCann? I keep going back to this and I keep asking you because, you know, ... it seems like each time we talk about it there's a little bit more that you have in you that you need to get out, and each time there's a little more detail. *I ask it because, you know, we are eventually going to have to put you in a grand jury. I don't want it coming out for the first time there, or worse, coming out after.*

*Id.* at 178–79 (emphasis added). At this juncture Friedrick related his own remorse

and anguish over his conduct, and how he had found it increasingly difficult to live with his lies. *Id.* at 178–81. But the day nonetheless closed, as it had begun, with the prosecutors focusing on Friedrick's going before the grand jury in Cleveland and the importance, in consequence, of learning the entire truth in advance of any such appearance.

Finally, as the interview continued into January 9, the focus of the prosecutors' questioning shifted. According to Chapman and Rogers, instead of viewing Friedrick as a prospective grand jury witness, they decided to explore explicitly the inconsistencies between Friedrick's August and September 1985 statements and those made at his January interviews. Tr. 313–14, 345–46, 354. On this the fourth consecutive day of interrogation, *the prosecutors for the first time specifically informed Friedrick that he could remain silent:*

> MR. ROGERS: At the time [of the previous statements], they advised you ... that you have to ... tell us the truth and that ... if you didn't, there was a possibility of some prosecution.
>
> What I want to do is go over these statements with you, but you don't have to answer these if you don't want to. I mean, if you don't want to go over it, just say so, but we would like to assess and see what your potential liability is. If you don't want to talk about it or answer questions, you don't have to. If you don't want to get into this, that's fine with me.

Transcript of Interview, January 9, 1986, at 264–65 (hereinafter Tr. 1/9/86).

In the wake of Rogers' representation, Friedrick immediately expressed uncertainty about what he was being told:

> MR. FRIEDRICK: What do you mean? You're advising me of my rights now; is that what you're saying?

*Id.* at 265.

In response to Friedrick's specific (and basic) questions, the DOJ attorneys equivocated:

---

11. Rogers began this portion of the interview with a reminder that the statement in September "was taken under other circumstances by some different individuals, and at that time you

were advised that ... there was no consideration ... about any possible prosecution of you except for one possibility, and that is if you didn't tell the truth." Tr. 1/8/86 at 3–4.

MR. ROGERS: In a sense. What we want to do, we're still trying to figure out whether the statements that were made earlier, you know, actually constitute lies....

*Id.*

Later in the same colloquy, Friedrick again expressed confusion as to his status. He indicated that he had understood that he was *required* to answer the prosecutors' questions; once again, the Government lawyers equivocated:

MR. FRIEDRICK: *I don't understand. All of a sudden I don't have to* [continue talking], *but, you know, up to this point I did.* Can you—
MR. ROGERS: Well, we're talking about two different things. Up to this point you were telling us what happened. Now what we're doing is we're going back over your different versions of the story. Okay? ...

*Id.* at 266 (emphasis added).

After discussing Friedrick's reluctance to provide details regarding Foran's or McCann's possible involvement and Friedrick's personal reasons for now telling the truth, the conversation turned once again to Friedrick's rights and obligations:

MR. FRIEDRICK: There is a tremendous reluctance on my part [to implicate Foran and McCann], there's no question about that. Thinking about down the road, when there's a trial, that I'm going to have to testify against these guys, okay, and the reluctance, of course, is not only based on friendship—that's part of it—but the reluctance is also based on the fact that I got this thing going. Okay?
I told you, you know, I feel like dirt. Okay? I mean, if you feel like dirt, you know, how much lower can you go?
MR. ROGERS: You've got to start up some time.
MR. FRIEDRICK: And I'm trying to get to that point where I've given you everything.
MR. CHAPMAN: Do you want to go through some of these statements?
MR. FRIEDRICK: Go ahead. I don't care.

MR. CHAPMAN: No time like the present, right?
MR. FRIEDRICK: Well, if we've got to do this, let's get going.
MR. ROGERS: We've got to do it sometime.

*Id.* at 270–71.

At this point, another pivotal exchange occurred concerning Friedrick's status:

MR. FRIEDRICK: Well, let me ask you, *is this a formal advisory of my rights? I think you've got to be honest with me, too.*
MR. ROGERS: *I know. That's why I hesitate in the answer.*

*Id.* at 271 (emphasis added).

Friedrick expressed perplexity at this response, pointing out that he was entitled to the same procedures as a suspect under questioning if the prosecutors were so viewing him:

MR. FRIEDRICK: That's what I mean. *You just tell me you don't have to answer these if you don't want to. What does that mean?* I can't just say that to somebody on the street. I have to say, you know, you're a suspect now and I've got to advise you of your rights.

*Id.* (emphasis added).

Instead of informing Friedrick of his status, however, the prosecutors replied in the following way:

MR. ROGERS: I guess the best and most honest way to put it is you've given a statement and you've given one that's contradictory. Okay? ...
Now, we've got two. You were advised the first time, in September ... [t]hat you had an obligation to tell the truth and that you could potentially be prosecuted if you didn't. And you didn't. Okay.
I don't know what we're going to do. I don't have this statement available to compare to the earlier one in September. I know there are areas where they contradict....
And I'm trying to be cautious. *I don't want to advise you of your rights and say, Bob, you know, we suspect you've*

*committed a crime in giving us this statement.*

*Id.* at 271–72 (emphasis added).

Friedrick then attempted to relieve Rogers of his uncertainty about whether he, Friedrick, had lied:

MR. FRIEDRICK: Well, *I'll tell you I did,* I'm pretty sure. I'm telling you that. *I did....*

*Well, my question* [whether he was being formally advised of his rights] *still stands.*

*Id.* at 272 (emphasis added).

At this point, the attorneys responded with an equivocal cautionary statement, followed by an indication of the uncertain nature of any possible indictment (as opposed to Friedrick's specific question regarding his status):

MR. CHAPMAN: I think anything you give us is something that can be used against you if we decide to proceed against you.

MR. ROGERS: But that determination hasn't been made. That's the best answer I can give you. Some of the things, without talking to you about it, appear to be lies, you might be able to say it's essentially the same thing as before. The variation is here. I remember there were a couple of things and I said gee, I'd really like to ask Bob about it to compare with what he's told us, but I did this on [January 6].

*Id.* at 273.

After these statements, Friedrick attempted to summarize his own status:

MR. FRIEDRICK: So essentially what you're saying is I can remain silent on this stuff if I want to.

MR. ROGERS: If you want to.

MR. FRIEDRICK: And that there's a potential here for prosecution....

Okay. I'm not going to belabor the point, but I thought when we started Monday you said we would start with a clean slate. So I thought that [is what] you meant, okay, let's start all over again. I think those are the words you used.

*Id.* at 273–74.

Chapman then proceeded to summarize what had transpired in the investigation, beginning with Friedrick's initial statements in the summer and fall of 1985, and continuing up through the on-going January interviews. In this recounting, Chapman stated that Friedrick did not have to answer any more questions if he did not wish to, stating, "You are familiar with your rights under the Fifth Amendment, I am sure." *Id.* at 275. After this summing up, Friedrick was asked if he had any questions. The following colloquy ensued:

MR. FRIEDRICK: The only question I have is the one I just asked you before.

MR. CHAPMAN: In terms of the clean slate?

MR. FRIEDRICK: *Before we went into the grand jury basically, what you meant by it.*

MR. CHAPMAN: As we have indicated here, I think on [January 6] when we first met with you, is that *we are interested in talking to you prior to considering taking your testimony before a Federal grand jury out in Cleveland and from that standpoint and from interviews this week we obviously were interested in finding out what the truth was.*

And I think in referring to a clean slate what we wanted to do in terms of getting information from you was *basically forgetting, if you will, for the moment what you testified to previously, but wanting to get to the bottom of the truth* as it relates to your knowledge of the events that transpired in Cleveland in the last several years....

MR. FRIEDRICK: Okay. I understand that. *The only thing I thought was, you know, this is your last chance to come forward before we go to the grand jury.* From my inference was, you know, chance meant to me, at least—and you didn't say that, but at least it was my thoughts—*that I had one more time to tell the story and not be subject to any prosecution.*

[S]o I don't even know if it was on the record the first time. But I understand what my position is now. Okay? Let's proceed. Go ahead.

MR. CHAPMAN: Well, I think, as we have indicated to you all along, *our reason for wanting to talk to you back here this week is that we can evaluate what you have to say before such time as we are interested in taking testimony from you before a grand jury.*

*Id.* at 276–77 (emphasis added).

After this pivotal interchange, the questioning resumed, principally focusing on Friedrick's veracity in his August and September statements. The interview concluded at the end of the day on January 9.[12] On February 4, 1986, Friedrick was again directed to return to Washington, which he did. At that point, Friedrick was advised that he should retain counsel, inasmuch as the Justice Department was actively considering seeking an indictment against him.

On May 15, 1986, an indictment for false statements under 18 U.S.C. § 1001 was returned against Friedrick. Friedrick moved to suppress all statements made during the period from June through September 1985, as well as those made in the January 1986 interviews. An evidentiary hearing was conducted on December 2–4, 1986, before Judge Revercomb, who concluded that the January 1986 statements had to be excluded under settled principles of Fifth Amendment law.[13]

In a Memorandum Opinion, Judge Revercomb found that the circumstances surrounding all of the interviews—from June through January—were identical in all material respects; that Friedrick was a target of a false statements prosecution prior to the January interviews, as evidenced by the Government attorneys' conscious decision not to administer a Form 645 before the interviews began; that the investigators consciously chose not to inform Friedrick of his constitutional rights even after it became apparent that he was confused as

to his status; that Friedrick's belief that he was compelled to answer questions on threat of dismissal was reasonable in light of his law enforcement experience and the conduct of the previous interviews; and that the investigators had failed properly to warn Friedrick of his constitutional rights even after he became a criminal suspect under interrogation.

In short, Judge Revercomb found from the totality of the circumstances surrounding the January interviews that Friedrick reasonably believed that if he refused to answer questions, he was subject to dismissal, and that the Justice Department lawyers did not disabuse him of this belief, even though, as they saw the situation, Friedrick was in no wise compelled to submit to questioning. Judge Revercomb therefore suppressed all statements made by Friedrick in the January 1986 interviews. This appeal followed.

## II

The Government contends that the District Court erred both in its findings of facts and conclusions of law. Urging that we are duty bound to adjudicate the issue of voluntariness based on the entire record, the Government maintains that Judge Revercomb's findings of fact are fundamentally defective and clearly erroneous. In particular, the United States emphasizes the distinct nature of the proceedings which unfolded on January 6, 1986 relative to what had gone before. The Government relies on the following factors to suggest that the FBI administrative inquiry had ended, along with any Form 645 immunity, by the time the January 6 interview began: (1) the interviews were conducted exclusively by Department of Justice attorneys; (2) over three months had elapsed since the most recent administrative interview in September 1985; (3) no Form FD-645 was furnished to Friedrick as had been the case on June 26, August 12 and 13, and September 18; (4) Friedrick was informed that a

---

12. Friedrick and Rogers conferred by telephone on the following day, and met again in Cleveland on January 13.

13. No issues relating to the admissibility of any of Friedrick's statements prior to January 1986 are raised on this appeal.

grand jury investigation was underway in Cleveland; and (5) DOJ lawyers specifically informed Friedrick that they suspected he had made false statements during prior interviews, and that they were therefore considering prosecuting him under 18 U.S.C. § 1001.

█ Acknowledging that Friedrick nonetheless enjoyed some form of informal transactional immunity as a prospective grand jury witness,[14] the Government maintains that that branch of immunity was irrelevant to the January interviews because those interviews involved testimony relating not to Friedrick's potential liability for obstruction of justice, but rather his potential liability under 18 U.S.C. § 1001. The Government further argues that any immunity Friedrick enjoyed (whether informal transactional or Form 645 use) was lost after he voluntarily submitted to the polygraph on January 7; at the latest, the Government urges, both types of immunity ended after he was formally advised of his Fifth Amendment privilege on January 9, and the questioning shifted to focus on Friedrick's prior statements rather than on the subject matter of the Cleveland grand jury investigation.

█ Friedrick counters that his responses during the January 6–9 interviews were shielded by dual grants of immunity. The first, upon which Friedrick principally relies, was use immunity flowing from the continuation, as Friedrick sees it, of the FBI administrative investigation carried on during the summer and fall of 1985.[15] The second, namely informal transactional immunity arising out of his role as a potential grand jury witness, see supra n. 14, likewise redounded to his benefit so as to render inadmissible any inculpatory statements made during the entire proceedings.

### A

Immunity statutes have a long history, and the Supreme Court has termed them "essential to the effective enforcement of various criminal statutes." *Kastigar v.*

14. Grand jury witnesses in the federal system normally are not automatically immunized by virtue of their testimony. Informal or "pocket" immunity arises by way of assurances by prosecutors—either orally or by letter—to a potential grand jury witness that he will be immune from any prosecution based on his testimony. Such decisions are made informally, outside the supervision of a court. The legality of granting informal immunity, while not litigated in this circuit, has been uniformly approved by our sister circuits. *See United States v. Anderson,* 778 F.2d 602 (10th Cir.1985); *United States v. Winter,* 663 F.2d 1120 (1st Cir.1981), *cert. denied,* 460 U.S. 1011, 103 S.Ct. 1250, 75 L.Ed.2d 479 (1983); *United States v. Librach,* 536 F.2d 1228 (8th Cir.), *cert. denied,* 429 U.S. 939, 97 S.Ct. 354, 50 L.Ed.2d 308 (1976); *see also United States v. Kilpatrick,* 821 F.2d 1456, 1470 (10th Cir.1987) ("[T]he use of 'informal immunity,' which has been frequently upheld, is entirely proper." (footnote omitted)), *cert. granted limited to different issue,* —— U.S. ——, 108 S.Ct. 693, 98 L.Ed.2d 645 (1988).

Despite the apparent regularity of its use and its apparent acceptance, the practice of granting informal immunity historically has not been the expected norm. Ordinarily, both in the past and up to the present, federal immunity was to be granted pursuant to statute. *See infra* pp. 393–394.

Although the federal immunity statute currently in force authorizes only "use" immunity, *see infra* p. 394, the precise scope of the informal immunity Friedrick enjoyed is ambiguous on this record. The Government concedes that Friedrick was immune from charges for obstruction of justice arising out of the Cleveland grand jury's investigation of the FBI's conduct during the Presser inquiry. Thus, it appears (and Government counsel suggested at oral argument) that Friedrick's grand jury immunity was transactional in nature; that is, Friedrick enjoyed complete immunity from prosecution relating to the subjects addressed in the Cleveland grand jury.

Beyond that, when and how Friedrick's informal immunity came to be is not clear. For present purposes, we need not address the propriety of the granting of informal immunity, because in this case nobody contests its existence and the issue has not been briefed or argued by the parties. It is enough in this case to say that during the January 1986 interviews in Washington, Friedrick appeared, at least in part, as a potential grand jury witness, who enjoyed informal transactional immunity in that role.

15. The immunity conferred by Form 645 is use, rather than transactional, in nature. This is so because the Government may still prosecute an individual for offenses relevant to statements compelled under Form 645; the Government may not, however, use such statements or their fruits against an individual in any prosecution other than for false statements.

*United States,* 406 U.S. 441, 447, 92 S.Ct. 1653, 1657, 32 L.Ed.2d 212 (1972) (citing *Hale v. Henkel,* 201 U.S. 43, 70, 26 S.Ct. 370, 377, 50 L.Ed.2d 652 (1906), and *Brown v. Walker,* 161 U.S. 591, 610, 16 S.Ct. 644, 652, 40 L.Ed. 819 (1896)). Justice Frankfurter, in oft-quoted language, referred to the concept of immunity as "part of our Constitutional fabric." *Ullmann v. United States,* 350 U.S. 422, 438, 76 S.Ct. 497, 506, 100 L.Ed. 511 (1956).

Until 1970, over 50 federal immunity statutes were on the books, *see, e.g.,* Act of June 10, 1920, ch. 285, § 307, as added Aug. 26, 1935, ch. 687, title II, § 213, 49 Stat. 856, previously codified at 16 U.S.C. § 825f(g) (repealed 1970); Act of July 5, 1935, ch. 372, § 11, 49 Stat. 455, previously codified at 29 U.S.C. § 161(3) (repealed 1970); Act of Aug. 21, 1935, ch. 597, § 4, 49 Stat. 671, codified at 33 U.S.C. § 506 (partially repealed 1970), covering a wide range of substantive areas. *See generally* Comment, *The Federal Witness Immunity Acts in Theory and Practice: Treading the Constitutional Tightrope,* 72 Yale L.J. 1568 (1963). But in 1970 Congress enacted the current federal immunity statute, which now governs the granting of immunity in federal courts and before grand juries, agencies, and Congressional bodies.

This statute is comprehensive in nature, and governs grants of immunity by federal prosecutors in a wide range of areas. Immunity of Witnesses Act, Pub.L. No. 91–452, title II, § 201(a), 84 Stat. 926 (1970), codified at 18 U.S.C. §§ 6001–6005 (1982). Under the statute, prosecutors must follow specific procedures in granting individuals immunity in return for compelling them to give up their privilege against compelled self-incrimination. Under 18 U.S.C. § 6003, before a prosecutor may grant immunity in a court or grand jury proceeding, he must receive approval both from the United States Attorney in the relevant judicial district, and from a designated high official in the Justice Department (§ 6003(b)); the immunity grant must also be approved by a federal district judge (§ 6003(a)). The scope of the immunity thus granted is limited to use immunity, that is, an assurance that statements made under the grant of immunity will be inadmissible in any future criminal proceeding, as will be any evidence obtained by prosecutors directly or indirectly as a result of the immunized statements. 18 U.S.C. § 6002.

## B

In *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), the Supreme Court upheld the federal immunity statute against constitutional challenge, holding that the protections afforded by use immunity are coextensive with the protections of the Fifth Amendment's prohibition against compelled self-incrimination. Prior cases, primarily *Counselman v. Hitchcock,* 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892), had seemed to suggest that only transactional immunity, that is, complete protection from prosecution for matters related to compelled testimony, was constitutionally permissible. But in *Kastigar,* the Court, relying in part on statements in *Murphy v. Waterfront Comm'n,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), limited the broad language of *Counselman,* and held that use immunity is coextensive with the protections of the Fifth Amendment privilege. The Court stated, "the Fifth Amendment grants neither pardon nor amnesty;" rather, the privilege "assur[es] that the compelled testimony can in no way lead to the infliction of criminal penalties." 406 U.S. at 461, 92 S.Ct. at 1665. Use immunity, the Court held, meets this standard.

■■■ Although criminal penalties may not attach as a result of immunized testimony,[16] there is no prohibition on other

---

16. It is quite clear, however, that the privilege against compelled self-incrimination never justifies the commission of perjury. *United States v. Wong,* 431 U.S. 174, 97 S.Ct. 1823, 52 L.Ed.2d 231 (1977); *United States v. Mandujano,* 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976) (plurality). "Our legal system provides methods for challenging the Government's right to ask questions—lying is not one of them." *Bryson v. United States,* 396 U.S. 64, 72, 90 S.Ct. 355, 360, 24 L.Ed.2d 264 (1969).

The prohibition on perjury is of course equally strong if testimony is given under a grant of immunity. In *United States v. Apfelbaum,* 445

undesirable consequences resulting from such testimony, or in the case of unimmunized statements, invocation of the Fifth Amendment privilege. Such permissible noncriminal consequences may include "personal disgrace or opprobrium," *Brown v. Walker*, 161 U.S. 591, 605, 16 S.Ct. 644, 650, 40 L.Ed. 819 (1896), possible loss of employment (in certain contexts), *Uniformed Sanitation Men Ass'n v. Commissioner of Sanitation*, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968); *Gardner v. Broderick*, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968), or threats of civil liability, *Pillsbury Co. v. Conboy*, 459 U.S. 248, 103 S.Ct. 608, 74 L.Ed.2d 430 (1983). *See also United States v. Apfelbaum*, 445 U.S. 115, 125, 100 S.Ct. 948, 954, 63 L.Ed.2d 250 (1980); *Ullmann v. United States*, 350 U.S. 422, 430, 76 S.Ct. 497, 502, 100 L.Ed. 511 (1956); *Smith v. United States*, 337 U.S. 137, 147, 69 S.Ct. 1000, 1005, 93 L.Ed. 1264 (1949). However, it is settled—and very relevant to this case—that one may not be required to relinquish one's privilege on threat of a penalty such as loss of job. *See Lefkowitz v. Cunningham*, 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977); *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).

 In the context of this case, both parties invoke the Supreme Court's decision in *Minnesota v. Murphy*, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984). *Murphy* held that, absent special circumstances, the Fifth Amendment privilege is not self-executing and thus must be invoked by an individual seeking to enjoy its protection. The Government relies on *Murphy*, reading its holding broadly to al-

low in Friedrick's statements since he failed to interpose the privilege during the course of the January 1986 questioning. In Friedrick's view, in contrast, his situation fits squarely within the line of authority, reaffirmed by *Murphy*, holding inadmissible any statements made under the threat of such penalties as loss of a job. *See, e.g., Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967) (individual threatened with discharge from employment if he exercised his Fifth Amendment privilege had not waived privilege even though he answered questions rather than refusing to talk); *Lefkowitz v. Cunningham*, 431 U.S. 801, 97 S.Ct. 2132, 53 L.Ed. 2d 1 (1977); *see also Murphy*, 465 U.S. at 434–39, 104 S.Ct. at 1146–48 (explaining penalties cases).[17] Under the *Garrity–Lefkowitz–Murphy* line of authority, Friedrick must have in fact believed his January statements to be compelled on threat of loss of job and this belief must have been objectively reasonable.

### III

 After careful review of the record, we are constrained to conclude that the District Judge's decision to exclude the statements was correct. The record reveals unmistakably, and indeed the Government commendably does not contest, that Friedrick enjoyed informal transactional immunity from prosecution in connection with obstruction of justice charges on the morning of January 6, when the pivotal set of interviews began. In addition to his transactional immunity as a grand jury wit-

---

U.S. 115, 100 S.Ct. 948, 63 L.Ed.2d 250 (1980), the Court held that prior immunized statements are admissible (subject to normal rules of evidence such as relevancy) in prosecutions for perjury; this holding applies with equal force to cases like Friedrick's, that is, prosecutions for false statements. There is even less reason to tolerate perjury in the context of immunized testimony than in the normal context, for by definition an immunized witness may not be penalized (at least criminally) by virtue of what he says; in fact, as has been painfully demonstrated to Mr. Friedrick, the only risk of criminal sanctions to which an immunized witness can be exposed arises if he is untruthful.

**17.** Custodial interrogation is the first exception to the rule, as explained in *Murphy*, that the Fifth Amendment privilege is not self-executing. We are persuaded that Friedrick was not in custodial interrogation of the sort that demands the full panoply of warnings fashioned by the Supreme Court to safeguard the Fifth Amendment privilege. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The third branch of exceptions enunciated in *Murphy*, dealing with statements made on income tax returns, *see, e.g., Marchetti v. United States*, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), obviously has no bearing on this case.

ness,[18] Friedrick also enjoyed the use immunity conferred upon him as an FBI employee subject to an administrative investigation. In that investigation, Friedrick was indisputably obliged to answer all questions truthfully. As Form 645 expressly provides, an FBI employee's refusal to answer can result in disciplinary action, including dismissal. That much is common ground. The issue before us, on which the parties are deeply divided, is whether Friedrick's belief that the administrative inquiry was continuing was reasonable, and whether Friedrick at any point during the January 6–9 interviews waived his Fifth Amendment privilege against compelled self-incrimination. The Government contends that Friedrick's pangs of conscience were his true motivator in confessing. We think, however, that if Friedrick's statements were made under immunity (or were otherwise involuntary), they retained that status for purposes of constitutional analysis regardless of any pangs of conscience on his part.

We will now examine in detail the particular points at which Friedrick's belief that he was under compulsion is alleged to have become unreasonable, or at which he is alleged to have waived the privilege. They include: a) at the beginning of the January 6 interview; b) statements relating to the polygraph interview on January 7—in agreeing to undergo the examination, in the conversation with the polygraph operator, and in the statements made on January 7 and 8 in the wake of his confession to the operator; and finally, c) after the colloquy on January 9 during which Friedrick was told for the first time that he could remain silent.

### A

We think it beyond reasonable dispute that when Friedrick initially appeared on January 6, he was acting under compulsion.

After all, Friedrick had been *ordered* by his FBI superiors to appear, just as had been done in August and September of the previous year. The Government contends, however, that once the interview began on January 6, the circumstances were so different from the various interviews that preceded the January 1986 events that Friedrick ought reasonably to have realized that the ground rules had changed and, more specifically, that his statements were no longer protected by the previously granted 645 immunity. Under these circumstances, the Government contends, a reasonable FBI agent of Friedrick's considerable experience would have realized that the FBI's administrative investigation had ended, and that he was now faced with an entirely distinct criminal investigation by the Justice Department. The Government's position is not without force; however, like Judge Revercomb, we are persuaded that it is in error.

First, as we saw in the narrative of events, Friedrick was ordered by his superiors in the Bureau to appear in Washington, D.C. for "further interviews." This directive was identical to that which he had previously received in the fall of 1985 and which had led to the prior interviews. Some of those interviews, it will be recalled, were conducted in the Justice Department building by DOJ and FBI personnel. What is more, the precise channel for communication of Friedrick's orders to appear, namely a directive from Special Agent Regalbuto in Washington communicated to Friedrick by his FBI superiors in Cleveland, was employed in January 1986 just as it had been in September 1985. At least until he walked in the door for the January 6 interviews, Friedrick had no reason to suspect that he was not there in his capacity as an FBI employee directed to attend and submit to an interview as a follow-up to the earlier proceedings. We

---

**18.** As the Government correctly indicated at oral argument, the record is unclear about the circumstances surrounding and the extent of this grant of immunity. *See supra* n. 14. As will become evident in the discussion to follow in the text, this immunity was relevant throughout the interviews on January 6–9. In our view, the Government lawyers clearly were aware of its existence and sought to have Friedrick rely upon it; for his part, Friedrick, even after being informed of his right to remain silent on January 9, indicated his belief that the grand jury immunity afforded him significant protections during the interviews.

also do not find the three-month gap significant, in view of the fact when the January interviews commenced the prosecutors focused, not on Friedrick's prior administrative immunity, but on his status as a potential grand jury witness enjoying informal transactional immunity. At the outset of the interview, Friedrick would therefore have had no reason to focus on whether the applicable ground rules had changed.

The Government emphasizes several factors indicating that an experienced FBI agent should have known the ground rules had changed on January 6. For example, no FBI personnel were present; indeed, the interviews were conducted solely by DOJ personnel. In these circumstances, according to the Government, it was unreasonable for Friedrick to think he was appearing pursuant to an internal FBI investigation.

We think not. *To the contrary, Friedrick had been informed from the beginning of the investigation that FBI and DOJ were conducting a joint inquiry.* It was therefore unremarkable that DOJ personnel conducted the interview. As we have seen, DOJ lawyers had participated in the interviews on prior occasions. The fact that Regalbuto was not present on January 6 does not reasonably suggest that the FBI—which after all had ordered Friedrick to appear—was somehow, without explanation, no longer involved.[19]

Nor does the fact that Friedrick was not provided with a Form 645 weigh heavily in the balance. As we saw before, Friedrick had had several follow-up communications with Regalbuto in the fall of 1985 where no Form 645s were employed. But, more fundamentally, the absence of a Form 645 on a particular occasion, without more, is of little moment in view of the rich history of what had gone before. The record reveals beyond question that FBI personnel, namely the experienced Regalbuto, viewed the January proceedings as a continuation of the 645 procedures; indeed, if the nature of the proceedings had in fact changed, then Friedrick reasonably would have expected

the entirely different Form 644 to be furnished to him. That, we cannot but observe, is precisely the tack taken by the two DOJ lawyers in their interactions with Foran, who in similar circumstances, upon being advised of the nature of the proceeding, declined to cooperate. *See* Tr. 333. As to Friedrick, however, the prosecutors determined not to furnish either Form 645 or 644 to him, and indeed to keep entirely mum on the subject. In our view, studied silence in this context is consistent with a continuation of the already established pattern; it is emphatically not a signal of an investigative *volte face.*

**B**

■ The next point at which the Government contends Friedrick waived his Fifth Amendment privilege was in agreeing to take a polygraph examination on January 7 and in executing the accompanying waiver form. According to the Government, the polygraph waiver was broad enough to bring in statements made to the operator after completion of the exam, as well as the subsequent statements in the resumed interview with Rogers and Chapman. The Government argues that although Friedrick's answers to specific questions during the exam may be inadmissible (under settled law concerning polygraph exams), anything that he said to the polygraph operator after the exam was completed was voluntary and therefore admissible.

In our view, this argument misses the mark. If the conversation with Minor is viewed as separate from the polygraph exam, Friedrick's status in talking with Minor was precisely the same as his status with Rogers and Chapman. In his conversation with Minor, Friedrick remained an FBI employee, present under compulsion. That he was not compelled to submit to the polygraph exam does not mean that he ceased being compelled to be present at all. In the absence of any warnings beyond the limited polygraph waiver, Friedrick's statements to Minor were of the same nature as

---

**19.** We also note that Regalbuto did in fact attend the interview, although he did not appear until January 7, We acknowledge, however, that

the extent of his participation, while not clear from the record, appears to have been minimal.

those made to Rogers and Chapman. The conversation with Minor was not a distinct event in terms of Friedrick's Fifth Amendment status.

The Government argues that the remainder of the resumed post-polygraph interview with Rogers and Chapman was rendered voluntary by virtue of (1) the polygraph waiver form, and, more persuasively, (2) Friedrick's inevitable conclusion that his career at the FBI was finished by virtue of the serious admissions he had made to Minor and then to Rogers and Chapman. As to the first argument, clearly the polygraph waiver was just that, nothing more. It cannot reasonably be maintained that when one submits to a polygraph exam, one also agrees to submit to general questioning thereafter outside the polygraph setting. The limited waiver by its own terms tends to foreclose just such a construction. After all, during the August 1985 interviews Friedrick agreed to take a polygraph (but later changed his mind). There is no suggestion that had Friedrick actually taken the polygraph at that earlier juncture, his 645 immunity would somehow have lapsed, thereby rendering all statements made thereafter admissible.

The Government's real argument is that Friedrick knew his number was up, and thus could not reasonably have thought that he was any longer under compulsion as an FBI employee. We are persuaded, however, both that Friedrick believed that he continued to be under threat of job sanctions if he refused to speak, and that this belief remained reasonable, even after his admissions following the polygraph examination. The reason for our conclusion is simple and straightforward: Friedrick was at all times during the questioning an FBI employee who was under orders from his superiors in the Bureau to attend and participate in the interviews. Friedrick had not been invited to come to Washington. He was instructed to appear, just as he had been several times previously. Friedrick was plainly in Washington, as Judge Revercomb concluded, in the capacity of an FBI employee who had no choice but to answer questions or else risk being fired. *Indeed, even after Friedrick admitted lying in September 1985, he continued to be treated by the Bureau as an employee.*

It is also significant that Friedrick's superiors continued to regard him as under their command—and therefore as an FBI employee—*after* the watershed events of January 9. Friedrick's appearance in Washington almost one month later—on February 4—was pursuant to orders similar to the ones he had received before each of the previous interviews. Thus, the FBI itself continued to treat Friedrick as an employee; no notice of termination or the like was provided to him. He was, it bears emphasis, in the posture of an FBI employee being directed by his superiors to carry on in the process of providing information relating to his duties. As long as Friedrick believed he had a job to lose—and the FBI never treated him otherwise—there was no reason for him to believe that the interviews were not obligatory in the same manner as his prior interviews.

Moreover, it bears noting again that the view of FBI personnel familiar with the interviews on January 6–9 was that Friedrick was indeed under compulsion. For example, Regalbuto believed that the interviews were a continuation of the previous internal investigation, as evidenced by his producing a Form 645 for Friedrick to execute on January 7; that understanding was reaffirmed by Regalbuto's testimony at the hearing before Judge Revercomb. *See* Tr. 140–41. What is more, in ordering Friedrick to appear for further interviews in January, Friedrick's FBI superior in Cleveland, Richard Schwein, likewise believed that those interviews were a continuation of the earlier process. *See id.* at 365. *See generally* Appellee's Brief at 43–44.

It thus will not do for the Government to have pursued a continual course of treating Friedrick as an employee—directing him time and again in his capacity as an employee to appear and cooperate in the investigation—and yet maintain that Friedrick should have concluded that his goose was sufficiently cooked that he was not in law an employee, and that the compulsion inherent in the 645 process had disappeared. This is metaphysics. It is subtlety of legal

argument that is belied by the hard, cold facts. Those facts, lest there be any mistake, are that the FBI chose, on its own accord, to keep Friedrick on the payroll and to order him around as an employee. There were no pink slips, no suspensions, no threats of discharge. The Government cannot now in conscience be heard to say that Friedrick was, to coin an unhappy phrase in this context, only a "phantom employee," one in form but not in substance. Until the FBI treated him as other than an employee—or even intimated that his employee status was in jeopardy—Friedrick's belief that the interview was compelled (under Form 645) remained reasonable. Our position, moreover, is not based solely on Friedrick's continued employment, but also on the fact that given the unrelieved pressures to which he was continually being subjected at the time the questioning shifted to his candidacy for a false statements indictment, he could not reasonably be expected to appreciate that the Form 645 process was now over, and that his job would inevitably be forfeited.

But that is not all. Friedrick was also a prospective government witness before the grand jury in Cleveland. It was that role, indeed, that the two prosecutors emphasized time and again during the four-day interview. Their statements in this respect were clear and plain—their intent was to put Friedrick before the grand jury in Cleveland. At a minimum, Friedrick was being evaluated for a possible appearance before the grand jury. And in that capacity as a prospective witness, Friedrick enjoyed, as the Government forthrightly admits, informal transactional immunity. Thus, to the extent that the prosecutors were directing questions to Friedrick as a prospective grand jury witness, he enjoyed immunity in that capacity as well. And that branch of immunity continued so long as Friedrick continued (or reasonably thought that he continued) to be in the role of a prospective grand jury witness.

The Government's position is further weakened by yet another oddity in its argument. According to the Government, Friedrick was present at the interview as an immunized prospective grand jury wit-

ness *and* as a potential defendant in a false statements prosecution. The Government contends that Friedrick was free to refuse to answer questions relating to his exposure as a potential defendant in a false statements prosecution; but, as an immunized witness, Friedrick had no choice but to answer questions relating to a possible grand jury appearance. We disagree that the admissibility of Friedrick's answers to questions, *i.e.*, whether each question, taken alone, was compelled, can in these circumstances depend on to which branch of Friedrick's status each question was directed. Just to state the relationship is to suggest its considerable complexity. This is especially so considering the close interrelation of the two "prongs" of questioning; the possible false statements by Friedrick and possible obstruction of justice in the Presser investigation both arose out of the same conduct by Friedrick and his colleagues. It belies reality to expect an interviewee—even an FBI veteran who graduated from the Naval Academy—to evaluate each question during the course of a four-day interview and to decide for himself each time whether the question is one he is compelled to answer or is, in contrast, one as to which he may remain silent.

Until the warning provided him on January 9, Friedrick continued, as we read this record, to enjoy *both* branches of immunity. He was, as it were, doubly immunized. We fail to see how, given the background existence of the Form 645 process and the continued references to his prospective appearance before a grand jury as an immunized witness (from charges of obstruction of justice), Friedrick could reasonably be expected to discern his "true" status. In these ambiguous circumstances, the Government cannot reasonably have expected Friedrick to read his interviewers' minds as to his purportedly changed status.

C

■ That brings us to the final point at which Friedrick's immunity is said to have disappeared, namely, the fateful colloquy on January 9 when the prosecutors informed Friedrick (for the first time) that he

could remain silent. The force of the Government's argument is manifest; the warning itself was set forth in clear terms. Before addressing the implications of this point, however, we cannot but observe that the January 9 warning stands as a rebuke to the Government's arguments, previously addressed, that all of Friedrick's statements during the four-day interview were voluntary. The final day is an odd time to be sharing with an interviewee a rather elemental rule of the game. Referees ordinarily provide ground rules before the beginning of the fourth quarter of play. So too, warnings by prosecutors are to be given in timely fashion; otherwise, the warnings are, *pro tanto*, for naught. The oddity of this late shift in rules thus places in bold relief the Government's assertions that the *entire* four-day proceedings represented a voluntary act on Friedrick's part.

In any event, the Government argues that, even if his prior statements were inadmissible by virtue of having been compelled, Friedrick was adequately warned on this final day of his right to remain silent and that he voluntarily chose to waive that right. In response, Friedrick argues that the warning was inadequate. In Friedrick's view, only a warning that made explicit that he could not be fired for refusing to talk would have sufficed.

Upon analysis of the transcript, we conclude, consistently with Judge Revercomb's well-considered analysis, that the apparent waiver on Friedrick's part was, in fact, beclouded by two factors: *first*, the prosecutors' continued reference to Friedrick's possible grand jury appearance; and *second* (and relatedly), the inadequate process of informing Friedrick in clear and understandable terms as to his status. We reiterate that up to the moment on that fourth day that he was informed he could remain silent, Friedrick, as an FBI employee appearing pursuant to an administrative inquiry, believed that he was under compulsion. In response to Rogers' first mentioning on that final day that Friedrick could remain silent, the latter exclaimed, "What

do you mean? You're advising me of my rights now; is that what you're saying?" Tr. 1/9/86 at 265.

Friedrick's reaction, in our view, was entirely understandable. It seems inescapable that the reason for the "warning," coming as it did so late in the four-day process, was that the ground rules had theretofore been different. Friedrick was now being told that he did not have to answer the questions at all. Coming on the heels of three days of thorough questioning, this sudden shift would strike a reasonable interviewee as odd. And so it was that this disharmonious chord prompted Friedrick to question his interrogators in the most basic way: "What do you mean?" Under the circumstances, a basic question like this called for a basic, straightforward answer. But one was not forthcoming. Seeking clarity, Friedrick instead was met with the following unedifying response: "In a sense." *Id.*

Later in the interview, Friedrick once again asked the prosecutors about his position: "Well let me ask you, is this a formal advisory of my rights? I think you've got to be honest with me, too." *Id.* at 271. At this pivotal juncture, Rogers equivocated. "I know. That's why I hesitate in the answer." *Id.* After being pressed by Friedrick to clarify his status, Rogers again equivocated:

> And I'm trying to be cautious. I don't want to advise you of your rights and say, Bob, you know, we suspect you've committed a crime in giving us this statement.

*Id.* at 272 (emphasis added). In these exchanges between Friedrick and his interviewers, it is manifest that Friedrick did not receive a clear advisory as to his status.

But one point remains in the Government's favor: *Friedrick stated himself that he understood his position and invited the interviewers to continue questioning.* [20] At first blush, a statement of this sort by an agent of 12 years' experience would seem to render voluntary any state-

---

**20.** We observe that Chapman explicitly mentioned Friedrick's Fifth Amendment rights, and that he was sure Friedrick knew and was aware of them. *See supra* p. 391.

ments made thereafter. But, although the question is not without difficulty, we, like Judge Revercomb, are in the end not persuaded.

The reason for our agnosticism is the brooding omnipresence of Friedrick's dual immunity. The repeated references by the prosecutors to his status as a grand jury witness during the four-day interview ineluctably suggest that Friedrick enjoyed the immunity flowing from that role. In addition, as we have previously recounted at tiresome length, Friedrick entered the interview room on January 6 as an FBI employee and remained in employee status throughout the four days. *It scarcely can be overemphasized that he was at no time treated in any manner other than as an employee.* Given his continuing status as an employee and our view that Friedrick reasonably believed the administrative process to be continuing, until he was told explicitly otherwise Friedrick's statements remained inadmissible. He would reasonably expect *not* to be treated as an employee if either his job was lost or his 645 immunity had lapsed. Even if this were not the case, and Friedrick realized on January 9 that the administrative inquiry was at an end, his statements indicate that he viewed the possible grand jury appearance as rendering his statements protected (and thus inadmissible). Without seeking unduly to extend this opinion, we quote once more from an important passage on that fourth day:

MR. FRIEDRICK: The only question I have is the one I just asked you before.

MR. CHAPMAN: In terms of the clean slate?

MR. FRIEDRICK: Before we went into the grand jury basically, what you meant by it.

MR. CHAPMAN: As we have indicated here, I think on [January 6] when we first met with you, is that we are interested in talking to you prior to considering taking your testimony before a Federal grand jury ... and from that standpoint and from our interviews this week we obviously were interested in finding out what the truth was.

And I think in referring to a clean slate what we wanted to do in terms of getting information from you was basically forgetting, if you will, ... what you testified to previously, but wanting to get to the bottom of the truth....

MR. FRIEDRICK: ... *The only thing I thought was, you know, this is your last chance to come forward before we go to the grand jury. From my inference was, you know ... that I had one more time to tell the story and not be subject to any prosecution.*

*Id.* at 276–77 (emphasis added).

This exchange tells us several things. First, from the outset of the interview, Friedrick believed that he was beginning with a "clean slate" and had one last chance to tell the truth without fear of prosecution. In light of the FBI's administrative inquiry and the repeated references to Friedrick's status as a potential grand jury witness, we cannot in conscience condemn Friedrick's belief in this respect as unreasonable. Second, according to Chapman's own words, the prosecutors had represented to Friedrick that he was in fact beginning with a clean slate in order to try to get to the truth, again an obvious reference to Friedrick's immunized status as a potential grand jury witness. Immediately after Friedrick said that he understood his status, Chapman once again referred to Friedrick as a potential grand jury witness:

Well, I think as we have indicated to you all along, our reason for wanting to talk to you ... this week is so that we can evaluate what you have to say before such time as we are interested in taking testimony from you before a grand jury.

*Id.* at 277.

In short, the prosecutors told Friedrick in one breath that he could remain silent, but in the next they said they remained interested in putting him in front of the Cleveland grand jury. Under these circumstances, it eludes us as to how Friedrick, on the heels of three days of questioning, could reasonably have been expected to know

with certainty his "true" position.[21]

## IV

For the foregoing reasons, we agree with Judge Revercomb that Friedrick's statements during the January 6–9 interviews were made under compulsion and are therefore inadmissible. Accordingly, the order of the District Court is

*Affirmed.*

---

21. Both the Government and Friedrick, assuming for the sake of argument that the January 9 warnings Friedrick received were adequate, rely on *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), in evaluating the admissibility of Friedrick's post-warnings statements. In view of our holding that the January 9 warnings were inadequate, we need not address these arguments.