THE STATE OF OHIO, APPELLEE, *v.* GRAHAM ET AL., APPELLANTS.

[Cite as *State v. Graham,* 136 Ohio St.3d 125, 2013-Ohio-2114.]

*Statements made by employees of state agency during an investigation conducted by the Ohio inspector general were coerced and are therefore inadmissible in subsequent criminal proceedings—Garrity v. New Jersey applied.*

(No. 2012-0338—Submitted January 22, 2013—Decided May 29, 2013.)

APPEAL from the Court of Appeals for Brown County, Nos. CA2010-10-016, CA2010-10-017, CA2010-10-018, CA2010-10-019, and CA2010-10-020, 2012-Ohio-138.

_____

**FRENCH, J**.

**{¶ 1}** This appeal asks whether the United States Supreme Court's holding in *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967)—that statements obtained from a public employee under threat of job loss are unconstitutionally coerced and inadmissible in subsequent criminal proceedings—required the trial court to suppress statements by employees of the Ohio Department of Natural Resources ("ODNR") during an investigation conducted by the Ohio inspector general ("OIG"). We hold that it did.

*Facts and Procedural History*

**{¶ 2}** At all relevant times, appellants were five upper-level employees of ODNR's Division of Wildlife ("DOW"): Division Chief David Graham, Assistant Chief Randy Miller, Human Resource Manager Michele Ward-Tackett, Law Enforcement Executive Administrator James Lehman, and District Manager Todd Haines.

**{¶ 3}** In September 2009, a confidential informant contacted the OIG to allege that Brown County DOW wildlife officer Allan Wright had engaged in misconduct that DOW officials had not investigated properly. According to the informant, Wright assisted his nonresident friend, a South Carolina wildlife officer, in obtaining an Ohio-resident hunting license by allowing him to list Wright's home address as his own. This allowed Wright's friend to pay a resident license fee of $19 instead of the nonresident license fee of $125.

**{¶ 4}** The OIG asked ODNR Director Sean Logan to investigate the alleged 2006 misconduct involving Wright and to prepare a report. The following month, Logan responded that the DOW had already completed an investigation in August 2008. Dissatisfied with the DOW investigation, the OIG assigned Deputy Inspector Ron Nichols to investigate. Nichols interviewed appellants—the DOW personnel involved in the Wright investigation—at different times between December 22, 2009, and February 1, 2010. Prior to the questioning, each appellant signed an oath that included the following statement: "I understand that by affirming my truthfulness under oath, I am subject to criminal sanctions if I provide false information." Nichols did not advise appellants of any right to counsel before each interview.

**{¶ 5}** During the interviews, appellants revealed that consistent with reciprocal practices in other states, prior practice within the DOW allowed wildlife officers from other states to obtain Ohio-resident hunting licenses as a way to encourage interstate networking and cooperation, although there are some discrepancies between the appellants' statements as to when the practice began and when it ended. In March and October 2008, appellant Graham issued memoranda reminding division employees about the need to purchase out-of-state licenses; the October memorandum expressly prohibited DOW employees from accepting free or discounted licenses in other states (even if those other states

allowed it) and from permitting nonresident friends to obtain free or discounted licenses in Ohio.

{¶ 6} Appellants told Nichols that after learning that Wright had allowed an out-of-state wildlife officer to use Wright's home address, they had decided to handle Wright's misconduct administratively rather than report it to the ODNR director as a possible criminal violation. Collectively, appellants determined that Wright's misconduct fell into the ODNR disciplinary-guidelines category of "failure of good behavior" and decided that a verbal reprimand was the proper sanction.

{¶ 7} During his questioning, Nichols asked each appellant whether Wright's falsification of the license was a crime and why they, collectively, had decided not to pursue a criminal investigation. He asked several of the appellants how they could have disciplined Wright administratively for a 2006 violation of an internal prohibition that did not exist until Graham's 2008 memo. And he suggested to appellants Haines and Graham that perhaps appellants had decided to issue a verbal reprimand for this nonexistent violation under the catchall category of "failure of good behavior" because then Wright could not file a grievance over it and no one would ever know about it. Each appellant testified at length, however, about the various factors that went into his or her decision-making, including the DOW's past practice of allowing nonresident wildlife officers to obtain resident licenses, Wright's history and tenure at the ODNR, and Wright's use of his own home address, which indicated that he was not trying to hide anything.

{¶ 8} In March 2010, the OIG issued an investigative report. The report concluded that Wright had committed wrongdoing by allowing an out-of-state wildlife officer to obtain an Ohio-resident hunting license using Wright's home address. Wright's excuse for doing so, according to the report, was that it was

common practice in southwest Ohio to allow out-of-state wildlife officers to obtain resident licenses.

{¶ 9} The report also concluded that appellants had improperly failed to report Wright's criminal conduct to the ODNR director or chief legal counsel, as required by the policies of the governor and the ODNR. The report stated that appellants had not verified whether Wright had been adhering to a common practice that his supervisors were aware of, as Wright claimed, and that appellants used the alleged practice as an "excuse to disregard the criminal violation." The OIG forwarded the report to the Brown County prosecuting attorney.

{¶ 10} In April 2010, a Brown County grand jury indicted each appellant on one count of obstructing justice and one count of complicity in obstructing justice, each a fifth-degree felony. Appellants filed motions to suppress or, alternatively, dismiss, on the ground that their statements to Nichols were coerced by threat of job loss and were therefore inadmissible under *Garrity*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562. The state countered that *Garrity* did not prevent the state from using the statements in the criminal proceedings, because Nichols had never threatened appellants with job loss or employment-related discipline and because the OIG lacked the authority to discipline appellants.

{¶ 11} At the suppression hearing, Nichols testified that he had contacted appellants by phone to set up the interviews and had not subpoenaed them. Nichols stated that he had never threatened appellants with termination or any form of job-related discipline. Appellants did not testify, although the state introduced transcripts of the statements appellants had made to Nichols.

{¶ 12} ODNR Labor Relations Administrator Bret Benack testified that appellants had known that they could be disciplined for refusing to cooperate with the investigation. Benack explained that under the ODNR disciplinary guidelines in effect at the time, an ODNR employee who failed to cooperate in an administrative investigation would have been subject to discipline ranging from

4

an oral reprimand up to removal, based on the number of prior offenses and the severity of the offense. According to Benack, appellants were aware of these policies and, as employees in "senior leadership" positions, would expect to receive more severe discipline.

{¶ 13} Benack also testified that appellants each received an ODNR "Notice of Investigatory Interview," which informed them that their refusal to cooperate could subject them to discipline. The notice contained the following warning: "This interview is part of an official investigation and failure to answer questions, completely and accurately, may lead to disciplinary action up to and including termination." Benack could not remember when appellants had received the interview notice, only that ODNR had issued the notice to appellants.

{¶ 14} The trial court suppressed appellants' statements, declaring them to be compelled statements and therefore inadmissible under *Garrity*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562. Acknowledging that Nichols had never expressly threatened appellants with termination, the trial court found that appellants had been "told by State's Exhibit 20 [the ODNR Notice of Investigatory Interview] they had to answer fully and truthfully or risk disciplinary action up to and including termination." The trial court further determined that appellants had known that ODNR's disciplinary policies and R.C. 121.45[1] required them to participate in the OIG investigation.

{¶ 15} The court of appeals reversed. Before conducting its legal analysis, the court of appeals rejected the trial court's finding that appellants had received an express threat of discipline via the ODNR Notice of Investigatory Interview. 2012-Ohio-138 at ¶ 32. Specifically, the court of appeals stated that it

---

1. R.C. 121.45 provides, "Each state agency, and every state officer and state employee, shall cooperate with, and provide assistance to, the inspector general and any deputy inspector general in the performance of any investigation. In particular, each state agency shall make its premises, equipment, personnel, books, records, and papers readily available to the inspector general or a deputy inspector general."

could not consider Benack's testimony that appellants had received the notice, because the copy of the notice admitted into evidence was undated and unsigned and because Benack's testimony as to when appellants received the notice had been stricken. *Id*. The court went on to determine that in the absence of any express threat, appellants had not been compelled within the meaning of *Garrity*. *Id*. at ¶ 145.

**{¶ 16}** We accepted appellants' discretionary appeal. *State v. Graham*, 131 Ohio St.3d 1539, 2012-Ohio-2025, 966 N.E.2d 893.

*Analysis*

**{¶ 17}** We must decide whether the trial court was correct in suppressing appellants' statements to Nichols, pursuant to *Garrity*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562.

**{¶ 18}** Appellate review of a suppression ruling involves a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. If competent, credible evidence supports the trial court's findings of fact, then the appellate court must accept those findings as true. *Id*. "[T]he appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id*., citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539 (4th Dist.1997).

**{¶ 19}** The Fifth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, *Malloy v. Hogan*, 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), states that "[n]o person * * * shall be compelled in any criminal case to be a witness against himself * * *." Article I, Section 10 of the Ohio Constitution similarly provides that "[n]o person shall be compelled, in any criminal case, to be a witness against himself * * *." The privilege against self-incrimination is generally not self-executing; a person "ordinarily must assert the privilege rather than answer if he desires not to

incriminate himself." *Minnesota v. Murphy*, 465 U.S. 420, 429, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984).

{¶ 20} This general rule is inapplicable, however, in certain well-defined situations, such as when a person's assertion of the privilege is penalized in a way that precludes that person from choosing to remain silent and compels his or her incriminating testimony. *Id.* at 434, quoting *Garner v. United States*, 424 U.S. 648, 661, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976). For instance, a person need not assert the privilege in cases in which the state compels the person to give up the "privilege by threatening to impose economic or other sanctions 'capable of forcing the self-incrimination which the Amendment forbids.' " *Murphy* at 434, quoting *Lefkowitz v. Cunningham*, 431 U.S. 801, 806, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977).

{¶ 21} In *Garrity*, the United States Supreme Court held that the constitutional protection "against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic." *Id.*, 385 U.S. at 500, 87 S.Ct. 616, 17 L.Ed.2d 562. *Garrity* does not, however, discount the important public interest in obtaining information to ensure effective governmental functioning. *Lefkowitz v. Turley*, 414 U.S. 70, 81, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973), citing *Murphy v. Waterfront Comm. of New York Harbor*, 378 U.S. 52, 93, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964) (White, J., concurring). Indeed, the United States Supreme Court has recognized that *Garrity* rests on reconciling the recognized policies behind the privilege against self-incrimination and the government's need to obtain information. *Turley* at 81. A state may compel a public employee's cooperation in a job-related investigation, so long as the employee is not asked to surrender the privilege against self-incrimination. *Id.* at 84. For example, the state may compel incriminating answers from its employee if neither those answers nor the fruits

thereof are available for use against the employee in criminal proceedings. *Id.*; *Jones v. Franklin Cty. Sheriff*, 52 Ohio St.3d 40, 44, 555 N.E.2d 940 (1990) (a grant of immunity preserves the privilege because no statement made in that context is incriminatory). But when the state compels testimony by threatening potent sanctions unless the witness surrenders the constitutional privilege, the state obtains the testimony in violation of the Fifth Amendment, and it may not use that testimony against the witness in a subsequent criminal prosecution. *Cunningham* at 805; *State v. Jackson*, 125 Ohio St.3d 218, 2010-Ohio-621, 927 N.E.2d 574, ¶ 14 (plurality opinion) (a prosecutor cannot make "direct or derivative use" of statements that were compelled under threat of termination). This balance "provid[es] for effectuation of the important public interest in securing from public employees an accounting of their public trust." *Cunningham* at 806.

{¶ 22} The public employees in *Garrity* were New Jersey police officers whom the state attorney general investigated, under the direction of the state supreme court, for fixing traffic tickets. *Id*. at 494. A New Jersey forfeiture-of-office statute in effect at the time stated that public employees would forfeit or be removed from their employment if they refused to testify upon matters relating to the employment on the ground that their statements might incriminate them. *Id*. at 494, fn. 1. Consequently, prior to questioning, each officer received warnings "(1) that anything he said might be used against him in any state criminal proceeding; (2) that he had the privilege to refuse to answer if the disclosure would tend to incriminate him; but (3) that if he refused to answer he would be subject to removal from office." *Id*. at 494. The officers answered the questions, and their statements were used against them in subsequent prosecutions for conspiracy to obstruct the administration of traffic laws. *Id*. at 495. The United States Supreme Court held that the statements had been coerced because the officers had been forced to choose between self-incrimination or job forfeiture

8

and so the statements could not be used in the officers' subsequent prosecutions. *Id*. at 496-497. According to the court, "[t]he option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent." *Id*. at 497.

**{¶ 23}** Compulsion within the meaning of *Garrity* is obvious in cases in which, as in *Garrity*, the state has expressly confronted the public employee with the inescapable choice of either making an incriminatory statement or being fired. In the absence of an express threat, however, several jurisdictions follow the holding of the United States Court of Appeals for the D.C. Circuit in *United States v. Friedrick*, 842 F.2d 382, 395 (D.C.Cir.1988), that an employee claiming compulsion "must have in fact believed his * * * statements to be compelled on threat of loss of job and this belief must have been objectively reasonable." *See*, *e.g.*, *McKinley v. Mansfield*, 404 F.3d 418, 436 (6th Cir.2005), fn. 20. Stated differently: " '[F]or statements to be considered compelled by threat of discharge, (1) a person must subjectively believe that he will be fired for asserting the privilege, and (2) that belief must be objectively reasonable under the circumstances.' " *State v. Brockdorf*, 291 Wis.2d 635, 2006 WI 76, 717 N.W.2d 657, ¶ 25, quoting *People v. Sapp*, 934 P.2d 1367, 1372 (Colo.1997). Determining whether an employee's subjective belief was objectively reasonable requires a court to examine the totality of the circumstances. *Brockdorf* at ¶ 36. The circumstances must show some demonstrable coercive action by the state beyond "[t]he general directive to cooperate." *United States v. Vangates*, 287 F.3d 1315, 1324 (11th Cir.2002). "[O]rdinary job pressures, such as the possibility of discipline or discharge for insubordination, are not sufficient to support an objectively reasonable expectation of discharge." *Sapp* at 1372.

**{¶ 24}** In our view, the *Friedrick* analysis is persuasive, as it ultimately examines the totality of the circumstances, an approach that is in keeping with this court's voluntariness jurisprudence, as well as that of the United States Supreme

Court. *See State v. Clark*, 38 Ohio St.3d 252, 261, 527 N.E.2d 844 (1988), citing *Fare v. Michael C.*, 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979) ("While voluntary waiver and voluntary confession are separate issues, the same test is used to determine both, i.e., whether the action was voluntary under the totality of the circumstances"). We therefore conclude that for a statement to be suppressed under *Garrity*, the employee claiming coercion must have believed that his or her statement was compelled on threat of job loss and this belief must have been objectively reasonable. In examining whether an employee's belief was objectively reasonable under the circumstances, evidence of an express threat of termination or a statute, rule, or policy demanding termination will almost always be sufficient to show coercion. *Brockdorf* at ¶ 3.

{¶ 25} In this case, the trial court and appellate court disagreed as to whether appellants had received an express threat before Nichols interviewed them. In suppressing appellants' statements, the trial court relied heavily on its finding of fact that appellants had received the ODNR Notice of Investigatory Interview warning that their failure to answer truthfully "may lead to disciplinary action up to and including termination." The court of appeals concluded that the record did not support this finding, because the copy of the ODNR notice, introduced as Exhibit 20, was undated and unsigned, and it did not indicate if or when appellants received it. *Graham*, 2012-Ohio-138, at ¶ 32. Given that Benack could only speculate (in testimony that was stricken) as to when appellants received the notice, the court of appeals stated that it could not "consider Benack's testimony that [appellants] received Exhibit 20." *Id.*

{¶ 26} The court of appeals' concern with the state of the record is understandable, but ultimately insufficient to justify discarding the trial court's factual finding. Although Benack could only speculate as to when appellants received the ODNR notice, he never wavered in his testimony that appellants had in fact received the notice. Benack, the senior adviser to the ODNR director on

issues relating to human resources, had personal knowledge that ODNR had notified appellants that they were the subject of an investigation and that "all of the [appellants] were issued Exhibit 20." The language in the notice itself implies that it is to be given to employees prior to an investigatory interview: "the investigatory interview *will* be held with you at [time] on [date] at [location]." (Emphasis added.) And given Benack's testimony that ODNR did not conduct its own interrogation of appellants, the trial court was free to conclude that ODNR issued the notice in relation to the OIG's investigation. This testimony was adequate to support the trial court's finding; the court of appeals should have accepted it and considered that finding as true in its analysis. *See Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶ 8.

**{¶ 27}** Appellants' receipt of the ODNR notice is dispositive. Although appellants did not testify at the suppression hearing, the threat of discharge contained in the notice was sufficient proof that they subjectively believed they could be fired for refusing to cooperate with Nichols. The threat also establishes that their belief was objectively reasonable, as it represented some demonstrable state coercion above the general directive to cooperate. Because appellants spoke to Nichols after being expressly warned by ODNR that their failure to do so would subject them to disciplinary action up to and including termination, we conclude that their statements were compelled under *Garrity*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562, as interpreted by *Friedrick*, 842 F.2d 382.

**{¶ 28}** In reaching this conclusion, we reject the state's characterization of the OIG as a toothless agency with little or no coercive power. While it was the ODNR (not the OIG) that compelled appellants' statements in this case, we reject the notion that the OIG is incapable of compulsion simply because it lacks the ability to arrest or directly discipline employees of other state agencies. The General Assembly established the office of the OIG in 1990 to "investigate alleged wrongful acts and omissions by state officers and state employees."

Am.Sub.H.B. No. 588, 143 Ohio Laws, Part IV, 5930. Pursuant to R.C. 121.42, the OIG has broad investigative powers. To determine whether wrongful acts or omissions have been committed, the OIG may "enter upon the premises of any state agency at any time, without prior announcement," question state employees, and inspect and copy any documents in the agency's possession. R.C. 121.45. Although the OIG cannot directly discipline employees of other state agencies, it is statutorily required to "report the wrongful acts or omissions, as appropriate under the circumstances, to * * * the person's public or private employer for possible disciplinary action." R.C. 121.42(C). In this respect, the purpose of the OIG's investigation is similar to the scope of the investigation conducted by the state attorney general in *Garrity*, who was ordered by the state supreme court to make a report.

{¶ 29} Nor do we embrace appellants' sweeping proposition that *every* OIG investigation is coercive within the meaning of *Garrity*. To be sure, this case has more in common with cases extrapolating from *Garrity* than it does with *Garrity* itself. Other than the express threat contained in the ODNR notice, there is scant evidence establishing that appellants subjectively believed that they were compelled to cooperate with the OIG investigation. Appellants did not testify at the hearing, and their claim of compulsion relied primarily on the ODNR disciplinary policy and the general duty to cooperate with OIG investigations under R.C. 121.45. Unlike the officers in *Garrity*, appellants were neither threatened by their interrogator nor confronted with a statute mandating removal from office. *See Murphy*, 465 U.S. at 437-438, 104 S.Ct. 1136, 79 L.Ed.2d 409 ("Unlike the police officers in *Garrity* * * *, Murphy was not expressly informed during the crucial meeting with his probation officer that an assertion of the privilege would result in the imposition of a penalty"). R.C. 121.45 does not, as appellants suggest, threaten any form of employment-related discipline.

Nevertheless, the express threat in the ODNR notice was sufficiently coercive so as to trigger the protections of *Garrity*.

### *Conclusion*

**{¶ 30}** Appellants answered questions after receiving a warning that they could be fired for failing to do so. Statements extracted under these circumstances cannot be considered voluntary within the meaning of *Garrity*. Accordingly, the court of appeals erred by reversing the trial court's suppression order. We therefore reverse the judgment of the court of appeals and reinstate the judgment of the trial court.

Judgment reversed.

O'CONNOR, C.J., and PFEIFER, O'DONNELL, LANZINGER, KENNEDY, and O'NEILL, JJ., concur.

_____

Jessica A. Little, Brown County Prosecuting Attorney, for appellee.

Gary Rosenhoffer, for appellant David Graham.

John Woliver, for appellant Randy Miller.

Michael P. Kelly, for appellant Michelle Ward-Tackett.

Michael E. Cassity, for appellant James Lehman.

J. Michael Dobyns, for appellant Todd Haines.

Paul L. Cox and Mike Piotrowski, urging reversal on behalf of amicus curiae, Fraternal Order of Police of Ohio, Inc.

_____