[Cite as *State v. Schimmel*, 2017-Ohio-7747.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellant* | : | Appellate Case No. 2017-CA-23 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-557 |
| | : | |
| CURTIS E. SCHIMMEL | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellee* | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 22nd day of September, 2017.

. . . . . . . . . .

ANDREW R. PICEK, Atty. Reg. No. 0082121, ANDREW P. PICKERING, Atty. Reg. No. 0068770, Assistant Prosecuting Attorneys, Clark County Prosecutor's Office, 50 East Columbia Street, Fourth Floor, Springfield, Ohio 45502
      Attorneys for Plaintiff-Appellant

ERIC E. WILLISON, Atty. Reg. No. 0066795, BRADLEY P. KOFFEL, Atty. Reg. No. 0062184, 1801 Watermark Drive, Suite 350, Columbus, Ohio 43215
      Attorneys for Defendant-Appellee

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} In this case, Plaintiff-Appellant, the State of Ohio, appeals from a trial court decision granting a motion to suppress filed by Defendant-Appellee, Curtis Schimmel. In support of its appeal, the State contends that the trial court erred in granting Schimmel's motion to suppress, because Schimmel's loss of possible government employment was not a penalty that constituted compulsion under the Fifth Amendment to the United States Constitution, but was a denied possible benefit. As a result, statements that Schimmel made during a pre-employment polygraph examination and interview were not compelled within the meaning of the Fifth Amendment, and the statements and fruits of the investigation that resulted should not have been suppressed.

{¶ 2} We conclude that the trial court erred in granting the suppression motion. Schimmel failed to assert his Fifth Amendment privilege against incrimination, and he did not fall within any established exceptions to assertion of the privilege. The interview and examination were part of a routine and accepted law enforcement application process, and Schimmel was not under any compulsion to continue. To the contrary, Schimmel could have ended the process at any time. Accordingly, the judgment of the trial court will be reversed, and this cause will be remanded for further proceedings.

I. Facts and Course of Proceedings

{¶ 3} The facts in this case are undisputed. On November 14, 2016, an indictment was filed against Curtis Schimmel, based on three counts of illegal use of a minor in nudity-oriented material or performance, in violation of R.C. 2907.323(A)(3). These were fifth-degree felonies, and the indictment alleged that Schimmel had viewed

material that showed a child in a state of nudity on or about August 18, 2016.

{¶ 4} In January 2017, Schimmel filed a motion to suppress, based on the failure of the Clark County Sheriff to immunize him concerning answers he gave to questions during a polygraph examination that was administered as part of the employment process with the Sheriff's Department.  At a pre-trial hearing held in February 2017, the parties submitted two exhibits that have not been included in the record.  No other factual evidence was submitted; however, the absence of the exhibits does not affect the appeal, because the parties agree that the facts are undisputed.

{¶ 5} As was noted, Schimmel sought employment with the Clark County Sheriff's Department, and as part of the employment process, was required to undergo a polygraph examination.  Before the examination was administered, and as a condition of continuing his application for employment, Schimmel was required to sign a consent form for the examination.  The form provided, in pertinent part, as follows:

> I, Curtis Schimmel voluntarily agree to take a polygraph examination for the mutual benefit of myself and the Clark County Sheriff's Office.
>
> I understand that I am being requested to undergo the polygraph examination regarding information I have provided on my polygraph questionnaire, application for employment, and interviews relating to my suitability for employment.  I understand the results of the examination, or my failure to cooperate during the test will be considered along with other factors indicating my suitability for employment.
>
> I fully realize that I do not have to take this examination, and that even in the proceedings, I can stop the examination at any time, simply by

telling the polygraph examiner to stop.   I also understand that if I choose to stop the examination, I forfeit further consideration of employment with the County of Clark.   I also give my consent to the use [sic] audio and/or video electronic recording equipment during this examination.

* * *

I hereby give the Clark County Sheriff's Office full and complete permission to disclose the findings and results of this comprehensive background investigation to those persons or parties having an interest in this examination, to include my current employer, or an appropriate law enforcement agency for the purpose of a criminal investigation, if any criminal, immoral or other concerning or disqualifying issues are discovered.   I understand that this disclosure may result in adverse consequences for me in my current job, including but not limited to termination from employment, negative reference for future employment, and possible criminal prosecution. . . .

* * *

I fully understand this waiver, and have been offered the opportunity to withdraw my application for employment to the Clark County Sheriff's Office.   I know [sic] request that Ohio Polygraph Services, LLC Examiner proceed with the actual interview and polygraph examination.   [signatures]

Joint Ex. 1, as referenced in the State's Brief, p. 2.

{¶ 6} After the form was signed, the polygraph examination was administered. During the pre-test interview, sexual conduct was an area that was covered.   At that time,

Schimmel disclosed that he had looked up pornography involving girls as young as 16 years of age as recently as one month before the examination. Joint Ex. 2, as referenced in the State's Brief, at p. 3. During the test, a "significant response" occurred when Schimmel was asked if he were withholding information about his sexual history. *Id.* at p. 4. After being further questioned, Schimmel stated that he liked "young girls," and said he had viewed pornography involving girls as young as ten years of age as recently as the past week; he also said he had done so previously on numerous occasions. *Id.* After further testing, Schimmel admitted that he had viewed images of girls as young as eight years old, and had maintained archives.

{¶ 7} Based on this information, the police obtained a search warrant and found 28 images of nude minors on Schimmel's electronic devices. Schimmel was then charged for the three counts of illegal use of a minor in nudity-oriented material or performance.

{¶ 8} After considering the evidence and arguments of the parties, the trial court granted the motion to suppress on February 28, 2017. In doing so, the court relied on *Lefkowitz v. Turley*, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973).

{¶ 9} *Turley* involved architects who had refused to sign waivers of immunity when summoned to testify before a grand jury about charges of conspiracy, bribery, and larceny. *Id.* at 75-76. After the district attorney notified various contracting authorities of their conduct and potential disqualification under statutes, the architects sued, asserting that their existing and future contracts had been threatened, and that the statutory provisions violated the right against self-incrimination. *Id.* at 76. The Supreme Court agreed, and held that the statutes were unconstitutional.

{¶ 10} In the case before us, the trial court concluded that the threat of forfeiting the possibility of future employment with Clark County was no less a substantial economic sanction than what was involved in *Turley*, and that Schimmel's Fifth Amendment right against self-incrimination had been violated. The court, therefore, suppressed the statements Schimmel had made, as well as evidence obtained from the search of his residence. The State now appeals the court's decision as of right, pursuant to R.C. 2945.67.

## II. Did the Court Err in Granting the Motion to Suppress?

{¶ 11} On appeal, the State presents the following sole assignment of error:

The Trial Court Erred in Granting the Defendant-Appellee's Motion to Suppress Statements Made During a Pre-Employment Polygraph Examination and the Fruits Thereof.

{¶ 12} Under this assignment of error, the State acknowledges that for current government employees, eliciting statements though threat of loss of livelihood imposes an unconstitutional burden. The State argues, however, that Schimmel's position is more akin to that of the defendant in *Garner v. United States*, 424 U.S. 648, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976). *Garner* involved the State's use of information that the defendant had reported on IRS forms. The information was used as evidence in the defendant's subsequent criminal prosecution for "conspiracy involving the use of interstate transportation and communication facilities to 'fix' sporting contests, to transmit bets and information assisting in the placing of bets, and to distribute the resultant illegal proceeds." *Id.* at 649.

{¶ 13} The court held in *Garner* that if witnesses wish to obtain Fifth Amendment protection, they must assert it; otherwise, they are not "compelled" within the meaning of the amendment. *Id.* at 654-655. *Garner* noted some exceptions, including custodial interrogations, failure to file tax returns specifically required of gamblers, and questioning of government employees under threat of termination. *Id.* at 657-662. According to the State, Schimmel's situation is more like that of the defendant in *Garner* because if Schimmel refused to answer the examiner's questions or had refused to submit to the examination, he would not have been subject to criminal prosecution. Instead, his only negative consequence would have been loss of being considered for a "possible" position with Clark County.

{¶ 14} In response, Schimmel argues that the State has incorrectly chosen among the facts in *Turley*. Schimmel argues that the district court decision in *Turley* indicates that the only harm *Turley* suffered was to be removed from a list of authorized bidders for public work, and that no mention was made of lost or withdrawn contracts. Schimmel also relies on a decision from the Third Circuit Court of Appeals, which indicates that items such as loss of future contracting privileges with a state are "penalties" that cannot be imposed on exercise of the Fifth Amendment right. Appellee's Brief, pp. 8-9, citing *United States v. Frierson*, 945 F.2d 650, 658 (3d Cir.1991).

{¶ 15} "Appellate review of a suppression ruling involves a mixed question of law and fact." (Citation omitted.) *State v. Graham*, 136 Ohio St.3d 125, 2013-Ohio-2114, 991 N.E.2d 1116, ¶ 18. "If competent, credible evidence supports the trial court's findings of fact, then the appellate court must accept those findings as true." *Id.* " '[T]he appellate court must then independently determine, without deference to the conclusion

of the trial court, whether the facts satisfy the applicable legal standard.' " (Citations omitted.) *Id.* Since the facts here are undisputed, our task is to independently decide if the facts satisfy the appropriate legal standards for suppression.

{¶ 16} "The Fifth Amendment provides that no person 'shall be compelled in any criminal case to be a witness against himself.' The Amendment not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Turley*, 414 U.S. at 77, 94 S.Ct. 316, 38 L.Ed.2d 274, citing *McCarthy v. Arndstein*, 266 U.S. 34, 40, 45 S.Ct. 16, 69 L.Ed. 158 (1924). Thus, "a witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant. * * * Absent such protection, if he is nevertheless compelled to answer, his answers are inadmissible against him in a later criminal prosecution." (Citations omitted.) *Id.* at 78.

{¶ 17} However, "the Fifth Amendment privilege generally is not self-executing * * *." *Minnesota v. Murphy*, 465 U.S. 420, 425, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984). Instead, if a witness "chooses to answer, his choice is considered to be voluntary since he was free to claim the privilege and would suffer no penalty as the result of his decision to do so." *Id.* at 429. There are well-known exceptions to the requirement of asserting the privilege: (1) "custodial interrogation"; (2) situations where the assertion is penalized to an extent that a " 'free choice to remain silent' " is foreclosed; and (3) situations where parties fail to file tax returns rather than identifying themselves as gamblers and asserting

the Fifth Amendment privilege. (Citations omitted.) *Id.* at 429-430, 434, and 439. The case before us involves Schimmel's claim to the "penalty" exception.

{¶ 18} In *Turley*, the court extended Fifth Amendment protections to independent contractors, noting its recent holding that State employees "may be compelled to respond to questions about the performance of their duties but only if their answers cannot be used against them in subsequent criminal prosecutions." *Turley* at 79, citing *Garrity v. New Jersey*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), *Gardner v. Broderick*, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968), and *Uniformed Sanitation Men Assn. v. Commr. of Sanitation of City of New York*, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968).

{¶ 19} *Garrity* involved police officers who were asked questions in an inquiry about the fixing of traffic tickets. They answered after being given "warnings that if they did not answer they would be removed from office and that anything they said might be used against them in any criminal proceeding. No immunity of any kind was offered or available under state law." *Turley* at 80. Subsequently, their answers were used in their prosecutions for conspiracy. *Id.* The court held in *Garrity* that " 'the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic.' " *Id.*, quoting *Garrity* at 500. In addition, *Garrity* held that "in the context of threats of removal from office the act of responding to interrogation was not voluntary and was not an effective waiver of the privilege against self-incrimination * * *." *Id.*

{¶ 20} Similar results occurred in *Gardner* and *Sanitation Men*, which involved,

respectively, a police officer who was discharged after he refused to waive his right against self-incrimination when summoned to testify before a grand jury, and public employees who were officially interrogated and told their refusal to answer and sign immunity waivers would lead to dismissal. *Turley*, 414 U.S. at 81, 94 S.Ct. 316, 38 L.Ed.2d 274.

{¶ 21} In analyzing the issues, the United States Supreme Court stressed the necessity of reconciling established policies behind the self-incrimination privilege and the governmental need "to obtain information 'to assure the effective functioning of government' * * *." (Citations omitted.) *Id.* The court then concluded that *Garrity*, *Gardner*, and *Sanitation Men* controlled. *Id.* at 82. In this regard, the court stressed that:

> The State sought to interrogate appellees about their transactions with the State and to require them to furnish possibly incriminating testimony by demanding that they waive their immunity and by disqualifying them as public contractors when they refused. It seems to us that the State intended to accomplish what *Garrity* specifically prohibited – to compel testimony that had not been immunized. The waiver sought by the State, under threat of loss of contracts, would have been no less compelled than a direct request for the testimony without resort to the waiver device. A waiver secured under threat of substantial economic sanction cannot be termed voluntary.

*Turley* at 82.

{¶ 22} The court also rejected the State's argument that different rules should

apply to public contractors because they might not entirely rely on State transactions for their livelihood. *Id.* at 83. In response, the court agreed with "the District Court that 'the plaintiffs' disqualification from public contracting for five years as a penalty for asserting a constitutional privilege is violative of their Fifth Amendment rights.' " *Id.*, quoting *Turley v. Lefkowitz*, 342 F.Supp. 544, 549 (W.D.N.Y.1972).

{¶ 23} Schimmel is partly correct when he asserts that the architects involved in *Turley* were not specifically challenging their dismissal from current contracts. The focus of the case appears to have been primarily on disqualification from future contracts. Specifically, the district court's opinion states that "[t]he plaintiffs in this action are licensed architects who have *in the past* been employed by various municipalities and state and county agencies in New York." (Emphasis added.) *Turley*, 342 F.Supp. at 545.

{¶ 24} The architects were called to testify before a grand jury, and upon their refusal to sign a waiver of immunity against subsequent prosecution, the district attorney sent a letter to various governmental parties and the architects' firms, notifying them that such a refusal required disqualification for five years of the architects and any firm of which they were a member "from contracting with any municipality or public authority, and any existing contracts may be cancelled by the municipality or public authority without incurring penalty." *Id.* at 548.

{¶ 25} After citing various authority, including *Gardner* and *Garrity*, the district court held that "[q]uite clearly, then, the plaintiffs' disqualification from public contracting for five years as a penalty for asserting a constitutional privilege is violative of their Fifth Amendment rights." *Id.* at 549. Thus, the case indicates that the major concern was over the five-year disqualification from future contracting, not dismissal or just dismissal

from a current job. However, the court did also state that the plaintiffs had asked for a judgment declaring the statutes in question unconstitutional, based on their claim that "the defendants now threaten to nullify the plaintiffs' employment opportunities and contractual rights." *Id.* at 546. There can be no "contractual" right absent an existing contract.

{¶ 26} Furthermore, on appeal, the United States Supreme Court stated that "[a]ppellees thereupon brought this action alleging that their *existing contracts and future contracting privileges* were threatened and asserted that the pertinent statutory provisions were violative of the constitutional privilege against compelled self-incrimination." (Emphasis added.). *Turley*, 414 U.S. at 76, 94 S.Ct. 316, 322, 38 L.Ed.2d 274. In view of the statements to this effect in both the trial court and the United States Supreme Court, we cannot entirely agree with Schimmel's position.

{¶ 27} In *Spevack v. Klein*, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967), the Supreme Court also applied the Fifth Amendment privilege to an attorney who refused to produce financial records during a judicial inquiry into professional conduct; the attorney was then disbarred based on his refusal to produce the records. *Id.* at 626-627. The court noted that in the context of the privilege against self-incrimination, " 'penalty' is not restricted to fine or imprisonment. It means, as we said in *Griffin v. State of California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 [1965], the imposition of any sanction which makes assertion of the Fifth Amendment privilege 'costly.' " *Id.* at 628, quoting *Griffin* at 614.

{¶ 28} Stressing that "constitutional provisions for the security of person and property should be liberally construed," the court noted that " '[t]he threat of disbarment and the loss of professional standing, professional reputation, and of livelihood are

powerful forms of compulsion to make a lawyer relinquish the privilege. That threat is indeed as powerful an instrument of compulsion as 'the use of legal process to force from the lips of the accused individual the evidence necessary to convict him * * *.' " *Id.*, quoting *United States v. White*, 322 U.S. 694, 698, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944).

**{¶ 29}** Ohio has applied the *Garrity* principles to various situations, including statements elicited during police internal affairs investigations and during investigations involving other public employees. *See, e.g.*, *Jones v. Franklin Cty. Sheriff*, 52 Ohio St.3d 40, 555 N.E.2d 940 (1990) (internal affairs); *State v. Jackson*, 125 Ohio St.3d 218, 2010-Ohio-621, 927 N.E.2d 574 (internal affairs); and *Graham*, 136 Ohio St.3d 125, 2013-Ohio-2114, 991 N.E.2d 1116 (employees of division of state agency of natural resources).

**{¶ 30}** The Supreme Court of Ohio has not ruled on the specific type of situation involved in the case before us. Recently, in *Graham*, the court considered whether the trial court had erred in granting motions to suppress filed by five upper-level employees of the Ohio Department of Natural Resources ("ODNR"), Division of Wildlife ("DOW"). After an investigation that the Ohio Inspector General ("OIG") had conducted, criminal charges were brought against these employees for obstruction of justice and complicity to commit obstruction of justice, based on statements the employees made during the OIG investigation. *Graham* at ¶ 9. The employees signed an oath prior to questioning, indicating they were subject to criminal sanctions for providing false information. They were not advised of any right to counsel. *Id.* at ¶ 4.

**{¶ 31}** Essentially, the OIG was investigating an allegation that the DOW failed to properly scrutinize misconduct of a Brown County DOW employee who had used his home address to obtain a cheaper hunting license for a non-resident South Carolina

wildlife officer. *Id.* at ¶ 3. The trial court suppressed the employees' statements, finding that they had been compelled and were inadmissible under *Garrity*. *Id.* at ¶ 14, citing *Garrity*, 385 U.S. at 493, 87 S.Ct. 616, 17 L.Ed.2d 562. The court of appeals then reversed the trial court, based on its conclusion that the employees had not been expressly threatened with discipline. *Id.* at ¶ 15. In this regard, an OIG deputy inspector testified that he had not threatened the employees with termination or any type of job-related discipline when contacting them for interviews. *Id.* at ¶ 11.

{¶ 32} An ODNR labor relations administrator testified that the employees had known they could be disciplined for refusing to cooperate, with sanctions ranging from oral reprimand to termination. *Id.* at ¶ 12. He also testified that the employees had each received an ODNR " 'Notice of Investigatory Review,' " which had informed them that refusing to answer questions " 'may lead to disciplinary action up to and including termination.' " *Id.* at ¶ 13. The court of appeals refused to consider this latter testimony and evidence, because the notice was undated, and the administrator's testimony about when the defendants received the notice had been stricken. *Id.* at ¶ 15.

{¶ 33} On subsequent appeal, the Supreme Court of Ohio reversed the court of appeals and affirmed the grant of the suppression motions. The court commented that "a person need not assert the privilege in cases in which the state compels the person to give up the 'privilege by threatening to impose economic or other sanctions "capable of forcing the self-incrimination which the Amendment forbids." ' " *Graham*, 136 Ohio St.3d 125, 2013-Ohio-2114, 991 N.E.2d 1116, at ¶ 20, quoting *Murphy*, 465 U.S. at 429, 104 S.Ct. 1136, 79 L.Ed.2d 409, which in turn quotes *Lefkowitz v. Cunningham*, 431 U.S. 801, 806, 97 S.Ct. 2132, 53 L.Ed.2d 1 (1977).

{¶ 34} Furthermore, the Supreme Court of Ohio stated that "[c]ompulsion within the meaning of *Garrity* is obvious in cases in which, as in *Garrity*, the state has expressly confronted the public employee with the inescapable choice of either making an incriminatory statement or being fired." *Id*. at ¶ 23. For less obvious situations involving lack of an express threat, the court adopted a totality of circumstances approach, and said that "for a statement to be suppressed under *Garrity*, the employee claiming coercion must have believed that his or her statement was compelled on threat of job loss and this belief must have been objectively reasonable. In examining whether an employee's belief was objectively reasonable under the circumstances, evidence of an express threat of termination or a statute, rule, or policy demanding termination will almost always be sufficient to show coercion." *Id*. at ¶ 24, finding persuasive the approach in *United States v. Friedrick*, 842 F.2d 382, 395 (D.C.Cir.1988). (Other citation omitted.)

{¶ 35} After considering the circumstances, the Supreme Court of Ohio held that the trial court had correctly granted the motions to suppress. The court concluded that although the labor administrator "could only speculate as to when appellants received the ODNR notice, he never wavered in his testimony that appellants had in fact received the notice." *Id*. at ¶ 26. In addition, the language in the notice implied that it was to be provided to employees before investigatory interviews. *Id*. Thus, the court concluded that the threat in the notice sufficiently proved that the employees subjectively believed they could be fired for refusing to cooperate and that their belief was objectively reasonable. *Id*. at ¶ 27.

{¶ 36} Notably, the court reached its decision even though the OIG lacked "the ability to arrest or directly discipline employees of other state agencies." *Graham*, 136

Ohio St.3d 125, 2013-Ohio-2114, 991 N.E.2d 1116, at ¶ 28. The court observed that the OIG is statutorily required to report omissions or wrongful acts to a person's public or private employer, for "possible disciplinary action." *Id.*, quoting R.C. 121.42(C). This, the court found, was similar to the state attorney general's role in *Garrity. Id.*

**{¶ 37}** The court also commented that, other than the threat in the ODNR notice, there was scant evidence indicating that the defendants "subjectively believed that they were compelled to cooperate with the OIG investigation." *Id.* at ¶ 29. In addition, R.C. 121.45, which imposed a general duty to comply with OIG investigations, did not threaten any kind of discipline. *Id.* Nonetheless, the court found the "express threat in the ODNR notice sufficiently coercive so as to trigger the protections of *Garrity*." *Id.*

**{¶ 38}** Although *Graham* does not answer the question of whether Schimmel's situation involved a "penalty" as he suggests, it does indicate that the Supreme Court of Ohio has not adopted a narrow view of the privilege. Specifically, the employees in *Graham* were subject to various discipline, up to, but not necessarily requiring, removal. And, as the court said, there was no express threat; instead, the court evaluated the situation under the approach it adopted, using subjective and objective criteria. In contrast, the officers in *Garrity* were explicitly told that refusal to answer would make them "subject to removal from office." *Garrity*, 385 U.S. at 494, 87 S.Ct. 616, 617, 17 L.Ed.2d 562. Similarly, Schimmel was expressly told that if he stopped the polygraph examination, he would forfeit all right to future employment – not just with the Sheriff's Department, but also with Clark County. Whether Schimmel occupied the same position as the employees in these other cases is a different issue, however.

**{¶ 39}** As was noted, Schimmel relies on *Frierson*, 945 F.2d 650, in which the Third

Circuit Court of Appeals commented that *Turley* had "declared unconstitutional a New York statute that required that public contractors either waive immunity and testify concerning their contracts or lose their current contracts and future contracting privileges." *Id*. at 659, citing *Turley*, 414 U.S. at 77-84, 94 S.Ct. 316, 38 L.Ed.2d 274. After making this observation, the court of appeals appeared to disagree with the United States Supreme Court's holding "that both of these sanctions were 'penalties.' " *Id.*

{¶ 40} In this regard, the Third Circuit Court of Appeals opined that "loss of current contracts would seem to be a 'penalty' and loss of future contracting privileges a 'denied benefit' within the meanings generally ascribed to those terms." *Id.* However, the court of appeals then went on to note that the Supreme Court's decision in "*Cunningham*, 431 U.S. at 804-08, 97 S.Ct. at 2135-37, also did not distinguish between termination of present office and disqualification from holding any office for five years; both were penalties that could not be imposed on the exercise of the privilege." *Id.* Accordingly, the court accepted the concept that both current and future losses can be penalties.

{¶ 41} In contrast to *Garrity* and other "penalty" cases, *Frierson* did not involve employment. Instead, it addressed "certain aspects of the interplay between the Fifth Amendment privilege against self-incrimination and § 3E1.1 of the [Federal Sentencing] Guidelines, which authorizes a two-level sentence reduction for acceptance of responsibility." *Frierson* at 652. Ultimately, the court of appeals concluded in *Frierson* that "an increase in sentence or a denied reduction in sentence is a penalty in the context of Fifth Amendment jurisprudence." *Id*. at 659-660. The court observed that "a number of courts, including the Supreme Court and this court, have recognized that denial of leniency is a penalty which cannot be imposed for the defendant's assertion of his or her

Fifth Amendment privilege."  *Id.* at 659.

**{¶ 42}** Despite this holding, *Frierson* also concluded that the situation before it did not fall within the exception to assertion of the privilege that "arises when the government threatens to penalize the assertion of the privilege, and thereby 'compels' incriminating testimony."  *Id.*, quoting *Murphy*, 465 U.S. at 434-439, 104 S.Ct. 1136, 79 L.Ed.2d 409, and citing *Garrity,* 385 U.S. at 496-500, 87 S.Ct. 616, 17 L.Ed.2d 562.   The court found its own situation more analogous to *Murphy*, which held a probationer's statement to his probation officer "voluntary and admissible" because "the threatened penalty must be specifically addressed to the exercise of the privilege for the defendant to claim ex post that he had been compelled to speak; it was not enough that the defendant may have reasonably believed his probation would be revoked for failing to answer his probation officer's questions."  *Id.* at 661, citing *Murphy* at 436-439.

**{¶ 43}** Ironically, the situation in *Frierson* seems similar to what was involved in the Supreme Court of Ohio's decision in *Graham* – a situation where an express threat does not exist, but the party claiming the benefit of an exception to assertion of the privilege argues that he or she "reasonably believed" that the penalty would occur if the privilege were asserted.   In this regard, the court of appeals stated in *Frierson* that:

> Importantly, the Court [in *Murphy*] noted that the case would have come out the other way if either of the following had occurred.   If Murphy had asserted his privilege to the probation officer and the state had revoked Murphy's probation because of that assertion, that would have been an unconstitutional penalty imposed on the exercise of the privilege.   *Id.* at 438, 104 S.Ct. at 1148.   Similarly, if Murphy had been told that he could

not refuse to answer on Fifth Amendment grounds - i.e., that his probation would be revoked if he claimed the privilege - and Murphy then talked to the probation officer, the statements would be considered "compelled" and could not be used against Murphy. *Id.* at 435, 104 S.Ct. at 1146. Because neither situation occurred in Murphy's case, however, the statements were voluntary and admissible. Minnesota had not taken the "extra, impermissible step" of threatening a penalty on the assertion of the privilege. *Id.* at 436, 104 S.Ct. at 1147.

Justice Marshall in dissent in *Murphy* argued that the "reasonable layman" would understand the requirement that he be truthful "in all matters" or lose probation to include a threat that probation would be revoked if he refused to answer on Fifth Amendment grounds. *Id.* at 447, 104 S.Ct. at 1152 (Marshall, J., dissenting). The majority disagreed. For statements to be considered compelled, the Court required that the threat of punishment be conditioned on the assertion of the privilege; a general requirement of truthfulness or disclosure could not be used after the fact to claim that incriminating statements had been compelled.

*Frierson*, 945 F.2d at 661, discussing *Murphy*, 465 U.S.at 435-438 and 447, 104 S.Ct. 1136, 79 L.Ed.2d 409.

**{¶ 44}** Based on *Murphy*, the court of appeals held in *Frierson* that "requiring a defendant to accept responsibility in order to obtain a sentence reduction is not a threat to impose punishment for an assertion of the privilege." *Id.* at 662. The court stressed that Frierson had made a voluntary statement to the FBI before he was indicted, and did

not elect to assert his Fifth Amendment privilege. Instead, he told the FBI that he did not have a gun during the bank robbery for which he was convicted. *Id.* The government also made no threats to Frierson.

**{¶ 45}** In addition, the court noted that during Frierson's presentence interview with the probation officer, "[t]he government made no threat directed against assertion of the privilege." *Id.* at 661-662. "Nevertheless, Frierson once again failed to assert his privilege." *Id.* at 662. Finally, before the presentence interview, the government had given Frierson a copy of a case from a Delaware district court.

**{¶ 46}** In that case, which was nearly identical to Frierson's, another court had refused to allow a reduction based on the defendant's contention that responsibility had been accepted. *Id.* The case did not concern a threat of imposing a penalty if the privilege were asserted; it simply "stated more explicitly what the Guidelines themselves require: that a defendant must accept responsibility for relevant conduct beyond the offense of conviction to obtain the reduction." *Id.* Thus, the court of appeals concluded that "[a]s with the Guidelines themselves, this [providing a copy of the decision] was not a threat sufficient under *Murphy* to hold any subsequent statement 'compelled.' " *Id.*

**{¶ 47}** Despite the fact that the defendant in *Frierson* failed to prevail, the court, nonetheless, adopted the position that denying a reduction in sentence is a "penalty" to which the Fifth Amendment applies. However, not all federal circuits agree with *Frierson*. Prior to oral argument, the State filed a notice of additional authorities that it intended to assert during argument. Of relevance is a decision of the Sixth Circuit Court of Appeals in *United States v. Clemons*, 999 F.2d 154 (6th Cir.1993).

**{¶ 48}** In *Clemons*, the defendant argued "that the district court violated his Fifth

Amendment privilege not to incriminate himself when it refused to award him the two-level reduction for acceptance of responsibility because he had not admitted the drug dealing he engaged in before the onset date of the indictment as described in the testimony of [his drug courier]." *Clemons* at 158. The guidelines in effect at the time allowed courts to reduce a defendant's base offense level by two levels if a defendant showed acceptance of personal responsibility for his conduct. *Id.*

{¶ 49} The Sixth Circuit Court of Appeals noted that there was a "deep division" among circuit courts about whether conditioning the two-level reduction on acceptance of responsibility would violate a defendant's Fifth Amendment rights. *Id.* at 159. Regarding this matter, the court stated that cases finding possible violations "generally follow a line of Supreme Court cases holding that the government 'may not impose substantial penalties because [an individual] elects to exercise his Fifth Amendment right not to give incriminating testimony against himself.' " *Id.* at 159, quoting *Cunningham*, 431 U.S. at 805, 97 S.Ct. 2132, 53 L.Ed.2d 1. *Cunningham* involved an attorney's refusal to sign an immunity waiver, and the refusal "automatically divested him of all his party offices and activated the five-year ban on holding any public or party office." *Cunningham* at 804. When discussing the penalty cases, the Sixth Circuit Court of Appeals also mentioned *Garrity*, *Murphy*, *Turley*, and *Gardner*. *Clemons* at 159.

{¶ 50} In *Clemons*, the Sixth Circuit Court of Appeals stressed that several circuits had avoided "the impact of the Supreme Court[']s so-called 'penalty cases' by distinguishing between a 'denied benefit' and a 'penalty.' These circuits hold that denial of the two-level reduction does not constitute a penalty and thus does not implicate the Fifth Amendment." (Citations omitted.) *Clemons*, 999 F.2d at 159.

{¶ 51} *Clemons* did not discuss the meaning of the term "denied benefit," but did adopt the reasoning of the Fourth Circuit Court of Appeals in *United States v. Frazier*, 971 F.2d 1076 (4th Cir.1992). *Clemons* at 161. "Denied benefit" appears to refer to the statement in *Frazier* concerning the government's position that "reduction [of sentence] is merely a benefit, or an act of leniency, the denial of which because the defendant refuses to provide potentially incriminatory information does not penalize a defendant's exercise of his Fifth Amendment rights." (Footnote omitted.) *Id.* at 1081. In the omitted footnote, the Fourth Circuit Court of Appeals commented that:

The government implicitly embraces the commonly held position that the conditioning of the receipt of a benefit upon the relinquishment of a constitutional right can never constitute compulsion within the meaning of the Fifth Amendment. In several cases, however, the Supreme Court has held that the conditioning of a benefit upon relinquishment of the Fifth Amendment right to remain silent constituted an impermissible penalty on assertion of that right. *See, e.g., Minnesota v. Murphy*, 465 U.S. 420, 435, 104 S.Ct. 1136, 1146, 79 L.Ed.2d 409 (1984) (loss of benefit of probation); *Cunningham*, 431 U.S. at 807, 97 S.Ct. at 2136 (forfeiture of future political office); *Turley*, 414 U.S. at 77-84, 94 S.Ct. at 322 (loss of benefit of future contracting privileges). As discussed *infra*, we believe that under the case-by-case inquiry required by the Court's decisions, * * * the single, and determinative question is whether the choice presented to the defendant is of such a character that he is effectively forced to surrender his right to remain silent. *See Garrity v. New Jersey*, 385 U.S. 493, 496, 87 S.Ct. 616,

618, 17 L.Ed.2d 562 (1967) (the question is "whether the [defendant] was deprived of his 'free choice to admit, to deny, or to refuse to answer' ") (quoting *Lisenba v. California*, 314 U.S. 219, 241, 62 S.Ct. 280, 292, 86 L.Ed. 166 (1941)).

(Citations omitted.) *Frazier*, 971 F.2d at 1081, fn. 8.

{¶ 52} Following these observations, *Frazier* discussed the "penalty cases," like *Cunningham*, *Turley* and *Murphy*. *Id*. at 1082-1083. The court then commented on a parallel line of Supreme Court cases in the plea bargain context, which did not cite the " 'penalty' cases," and also had "rejected claims that the offer of lower sentences in exchange for guilty pleas impermissibly compels a defendant to incriminate himself." *Id*. at 1083, discussing *Corbitt v. New Jersey*, 439 U.S. 212, 216, 99 S.Ct. 492, 58 L.Ed.2d 466 (1978).

{¶ 53} In *Frazier*, the court concluded that the choice presented by the two-level reduction "acceptance of responsibility" guideline was more analogous to the plea bargain cases than "the choice faced by the plaintiffs in the employment penalty cases." *Id*. at 1084. The differences between those cases and employment cases included the " 'incidental consequence' of a legitimate governmental practice of encouraging, through leniency in sentencing, both cooperation with law enforcement authorities and contrition on the part of the defendant." (Citation omitted.) *Id*. They also included the fact that the choice confronting a defendant in a sentencing case "is not 'likely to exert such pressure upon an individual as to disable him from making a free and rational choice.' " (Citations omitted.) *Id*. at 1085.

{¶ 54} Although the case before us involves an employment situation, we need not

base our decision on whether it involves a "denied benefit" or a "penalty." While Schimmel's argument is persuasive in some respects, the circumstances before us are fundamentally different than the employment cases finding Fifth Amendment violations. Specifically, even though we reviewed cases in both state and federal jurisdictions, we could not find any situation in which Fifth Amendment rights have been extended to statements elicited during a pre-employment interview.

{¶ 55} In *Murphy*, the Supreme Court stressed that "[i]n each of the so-called 'penalty' cases, the state not only compelled an individual to appear and testify, but also sought to induce him to forgo the Fifth Amendment privilege by threatening to impose economic or other sanctions 'capable of forcing the self-incrimination which the Amendment forbids.' " *Murphy*, 465 U.S. at 434, 104 S.Ct. 1136, 79 L.Ed.2d 409, quoting *Cunningham*, 431 U.S. at 806, 97 S.Ct. 2132, 53 L.Ed.2d 1.

{¶ 56} For example, in *Garrity*, the New Jersey Supreme Court had ordered the state's attorney general to investigate alleged irregularities in the municipal court. *See State v. Naglee*, 44 N.J. 209, 219, 207 A.2d 689 (1965), *reversed by Garrity*, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562. After a "long preliminary investigation," a deputy attorney general scheduled the taking of statements from the police officer defendants, and a court stenographer recorded the statements. *Id.* By statute, these officers were required to testify on matters concerning their employment, and were subject to removal from their positions if they refused to testify. *Id.* at 220, citing former N.J.S. 2-A:81-17.1. As was noted, the United States Supreme Court held on appeal that the officers' statements were coerced in violation of the Fifth Amendment, and could not be used in subsequent criminal proceedings. *Garrity* at 500.

{¶ 57} Likewise, in *Turley*, the architects were summoned to testify before a grand jury, and had no choice other than to testify and waive their Fifth Amendment rights, or to assert their rights and be penalized. *Turley*, 414 U.S. at 75-76, 94 S.Ct. 316, 38 L.Ed.2d 274. The statutory penalty for asserting their rights was potential cancellation of existing contracts and disqualification from future contracting opportunity for five years. *Id.* at 71, fn.1. In *Cunningham*, the attorney was subpoenaed to appear before a grand jury and refused to waive immunity. By statute, his refusal terminated his current political party office and prevented him holding any other public or party office for five years. *Cunningham*, 431 U.S. at 802-803, 97 S.Ct. 2132, 53 L.Ed.2d 1.

{¶ 58} The court stressed in *Garrity* that "[w]here the choice is 'between the rock and the whirlpool,' duress is inherent in deciding to 'waive' one or the other." *Garrity* at 498. However, no such rock and whirlpool existed in the case before us. In contrast to the above cases, Schimmel was not compelled to appear before any kind of inquiry or judicial body, nor was he required to do anything. Instead, he voluntarily applied for a job with the Sheriff's Department, and chose to give statements and take a polygraph. Notably, this was not a criminal investigation; it was simply part of a routine process of applying for a law-enforcement position.

{¶ 59} In *O'Hartigan v. Dept. of Personnel*, 118 Wash.2d 111, 821 P.2d 44 (1991), an applicant for a position with the Washington State Patrol was told that as part of the screening process, she would have to take a polygraph examination. *Id.* at 114. After refusing to take an examination, she was told that she could not be considered for a word-processing job for which she had applied. *Id.* at 116. The applicant then brought suit against the Washington State Department of Personnel, claiming that the polygraph

examination violated her state and federal rights to privacy. *Id.* However, the Supreme Court of Washington disagreed.

**{¶ 60}** The court noted that under an applicable Washington State statute, polygraph testing was generally prohibited for employment screening purposes, but was allowed for initial applications with law enforcement agencies. *Id.* at 119. According to the court, this distinction was supported by the State's legitimate governmental interest "in providing its citizens with law enforcement agencies free of corruption and secure in their employees' access to sensitive information." *Id.* In this vein, the court emphasized that other screening methods asserted by the applicant, "such as probationary periods and background checks, are, as the State argues, vulnerable to dishonest responses by either an applicant or the applicant's background references and were not deemed adequate by the Legislature. Moreover, a probationary period allows persons access to law enforcement premises, documents, and perhaps investigative information during the evaluation period, before a satisfactory assessment can be made." *Id.*[1]

**{¶ 61}** Ohio does not have a similar statute, but polygraph examinations have been used for many years in connection with public service positions. *See, e.g., Vincent v. Civ. Serv. Comm., City of Zanesville*, 54 Ohio St.3d 30, 560 N.E.2d 226 (1990) (applicants were improperly removed from civil service eligibly list for firefighter positions after they disclosed prior drug use during polygraph examinations); *State v. Karnhem*, 2d Dist. Miami No. 78-CA-17, 1979 WL 208592, *1-2 (Apr. 6, 1979) (testimony about routine pre-employment polygraphs as well as polygraphs administered to undercover agent after the

---

[1] The court did indicate that the State was required to adopt guidelines for follow-up questions, to prevent " 'unbounded, standardless inquiry.' " *O'Hartigan*, 118 Wash.2d at 121, 821 P.2d 44, quoting *Thorne v. City of El Segundo*, 726 F.2d 459, 470 (9th Cir.1983).

defendant's alleged crimes was improperly admitted to buttress agent's credibility. However, the defendant waived any error by failing to object at an appropriate time or to request curative instructions).[2]

{¶ 62} In addition, Ohio courts have held that results of polygraph tests administered by a police agency for employment purposes are public records and are subject to disclosure. *See, e.g.*, *State ex rel. Lorain Journal Co. v. Lorain*, 87 Ohio App.3d 112, 115, 621 N.E.2d 894, (9th Dist.1993) (polygraph records not exempt from disclosure); *State ex rel. Multimedia, Inc. v. Snowden*, 72 Ohio St.3d 141, 143, 647 N.E.2d 1374 (1995). ("[i]nvestigatory reports compiled by law enforcement agencies to assist employment decisions do not constitute confidential law enforcement investigatory records excepted from disclosure under R.C. 149.43, since they do not directly involve law enforcement.")

{¶ 63} In short, there was no compelled testimony before an investigatory body or proceeding in this case that would warrant application of a suppression remedy. Schimmel also lacked any property interest in employment with the Sheriff's Department or with Clark County. "Property interests * * * are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 578, 92

---

[2] Federal law does ban the use of polygraphs in various situations, including the pre-employment process, but exempts the United States government, as well as state and local governments and their political subdivisions, from the prohibition. *See* 29 U.S.C. 2002 and 29 U.S.C. 2006(a), which are part of the Employee Polygraph Protection Act of 1988.

S.Ct. 2701, 33 L.Ed.2d 548 (1972).

{¶ 64} In this vein, the Supreme Court of Ohio has held that "it is virtually axiomatic that there is no constitutionally protected right to public employment." (Citations omitted.) *Walton v. Montgomery Cty. Welfare Dept.*, 69 Ohio St.2d 58, 64, 430 N.E.2d 930 (1982). Even probationary civil service employees do not have a property interest in continued employment. *State ex rel. Rose v. Ohio Dept. of Rehab. & Corr.*, 91 Ohio St.3d 453, 457, 746 N.E.2d 1103 (2001). *Accord Fletcher v. Ohio Dept. of Transp.*, 10th Dist. Franklin No. 12AP-46, 2012-Ohio-3920, ¶ 11.

{¶ 65} Schimmel was free to apply for employment, and he was also free to disengage himself from the employment process at any time. He did not do so, and we find no evidence of coerced testimony within the meaning of the Fifth Amendment. Accordingly, the State's sole assignment of error is sustained, and the judgment of the trial court will be reversed.

## III. Conclusion

{¶ 66} The State's sole assignment of error having been sustained, the judgment of the trial court is reversed, and this cause is remanded for further proceedings.

. . . . . . . . . . . . .

TUCKER, J., concurs.

FROELICH, J., concurring in judgment only.

Copies mailed to:

Andrew R. Picek
Andrew P. Pickering
Eric E. Willison
Bradley P. Koffel
Hon. Richard J. O'Neill